## Dibble *v.* Hutton.

M ARY HUTTON brought a petition in chancery, to the County Court, stating, That she was the widow of *Samuel Hutton*; and that during his life they were tenants in common of 55 acres of land, lying in Norwalk, three fourths of which were owned by him, and one fourth by her. He importuned her to join with him, in conveying said land, representing to her, that it was of small profit to them, and that he could not sell his interest alone, without great loss. She, however, refused to comply with his request; but afterwards, to induce her to join in the conveyance, he offered, and solemnly promised, to pay to her one fourth part of the sum, for which said 55 acres sold, for her separate use, and to lodge with her sufficient security for the performance of his engagement. In consequence of which, she agreed to sell, and on the 6th of January, 1798, actually

An agreement entered into between husband and wife, during coverture, is void, and cannot be enforced in chancery against the executor of the husband.

joined in conveying said land to *Caleb Comstock*, and *Benoni St. John*; who then executed their notes to said *Samuel* for the sum of 192*l*. 10*s*. with interest. And said *Samuel* did immediately, in pursuance of his promise, as he then declared, deliver part of said notes to the petitioner, which she kept in a drawer, in her separate custody, till the time of the death of said *Samuel*, which happened on the 16th of September, 1799.

In May, 1792, said *Samuel* made his will, and disposed of all his estate, and gave to the petitioner nothing more than that part of his real estate, which she could claim as her dower. He appointed *Nehemiah Dibble* executor of his last will, who accepted the trust, and said will has been proved, and approved. The petitioner exhibited her claim to one fourth part of said 192*l*. 10*s*. to the executor, within the time limited, by the Court of Probate, for the exhibition of claims; but the executor refused to allow it. And in October, 1799, the executor applied to the petitioner for the notes, which she so held as security, and threatened her with a suit, if she would not deliver them up to him, that he might include them in the inventory of the estate of said *Samuel*. And the petitioner did deliver them up, with an express reserve, that her claims should not be prejudiced thereby.

The executor has since received the money, upon said notes; the estate of said *Samuel*, after payment of his debts, is of the value of $ 20,000; but the petitioner, notwithstanding, is left dependent upon her friends, for support, and has received no compensation for her land, and has no remedy at law. The petitioner concluded her petition by praying, that the executor might be ordered, within a reasonable time, to pay her one fourth part of said 192*l*. 10*s*. with interest.

To which petition there was, in the County Court, a demurrer ; and the petition was adjudged to be sufficient ; the facts stated therein were, upon enquiry, found to be true ; and a decree passed, ordering the executor to pay from the estate of said *Samuel,* one fourth part of the sum of 192*l.* 10*s.* with interest from the 6th of January, 1798, being in the whole $211 3. Upon a writ of error to the Superior Court, the judgment of the County Court was affirmed.

*Smith,* (of Woodbury) for the plaintiff in error, contended, that if giving the notes to the wife strengthened her claim, by giving them up, she relinquished any such advantage.

The contract was not to be performed after the death of the husband, but during coverture.

The question, therefore, is, whether a contract, by husband and wife, made during the coverture, and to be performed during coverture, is a legal, valid contract?

It has hitherto been considered, as one of the most settled principles in our jurisprudence, that a contract, made by a *feme covert,* especially with *her husband,* is absolutely void.

Alimony and separate maintenances, though anciently unknown, have now become common in England. A practice has, also, been introduced, of relations giving property to the sole and separate use of married women ; covenants by the husband, that the wife shall have certain benefits, have been sanctioned by their courts ; and she thus has interests separate from, and independent of her husband. And during coverture, the husband,

1804.

DIBBLE
v.
HUTTON.

through the medium of trustees, has been enabled to settle property on the wife; but now the intervention of trustees is no longer held necessary.

Lord MANSFIELD, in the case of *Corbett* v. *Poelnitz*, (*a*) says, " That as the times alter, new customs, and new " manners arise, and new exceptions and applications of " the rules of law must be made." And to be sure, manners have led the law, and law the manners, till all barriers are thrown down. And are we to go on in their tracks, not by degrees, but to take, at once, the last step, which corruption has there introduced, and bury in oblivion the principle, that a feme covert has no separate existence?

In this State, but one divorce *a mensá et thoro* has been granted; and, at present, it is probable, no more will be granted.

There here exists no custom of separation from whim and caprice, though instances have occurred where tempers were very different. Of marriage arrangements not an instance is known. We happily have never heard of forming certain exceptions to the marriage contract, when framed, that the wife need not lose her independence; nor of relations giving property to married women, to their separate use. But the idea has here been, that lines of separation were not to be drawn between husband and wife; and the generosity of our females has not allowed them to wish to keep their property from those, to whom they have not refused their persons. *Our customs*, therefore, do not require the introduction of these new principles.

(*a*) 1 *Term Rep.* 8.

But if divorces *a mensâ et thoro*, and separate maintenances, and property in the hands of trustees, for the benefit of the wife, are to be sanctioned ; still it does not follow, that a contract between husband and wife is to be held valid.

A contract opposed to sound policy is void. Upon principles of policy, what good consequences can result from pin-money, and separate establishments? While husband and wife have but one interest, you may calculate upon the most perfect harmony ; but create separate interests, and you destroy domestic tranquillity. While both go to the same purse, it may be expected, that each will promote what is the interest of both.

If such contracts have a legal existence, there must be a mode of enforcing them ; and if the wife may bring the husband in debt, he may her ; and judgments and executions may, as in other cases, be obtained.

Again, if a legal contract may be made between husband and wife, she may discharge it ; and if so, will there not be additional inducements to coercion? Separate accounts and books must be kept. If, in this case, the husband had taken these notes into his own possession, the wife might have called her husband to account ; she might have levied an execution upon his house, or land ; or transported him to prison. The idea of such a state of things cannot, for a moment, be admitted.

But, it may be said, is not justice due to this woman ? When we are investigating subjects, which will have an effect upon community, and establishing precedents, which will abide, we ought not to attend to the supposed equity of a *particular case.* In the several classes of con-

tracts void, because against sound policy, particular instances may be found of contracts made with minors, and usurious contracts, which are perfectly fair, and equitable; but even in those cases, the general rule must be regarded.

If society was here, as in England, and vast estates were depending upon the principle, there might be some reason for adopting it ; but, by granting this application, you destroy, at a stroke, one half of what we have ever deemed the marriage contract. That such a case was never before heard of in Connecticut, shows, that such contracts were never expected to be enforced.

But, admitting that such a contract ought to be enforced ; still, it ought to be done in a court of law, either by an action on the case, stating the facts, or by a suit on the bond.

In England, it is a common rule, that application is not to be made to chancery, where there is remedy at law ; and that chancery has jurisdiction, only in cases of fraud, accident, and trust. In cases like this, the English court of chancery has assumed jurisdiction, on the ground, that the husband was trustee for the wife. But Lord MANSFIELD has once suffered a recovery, at law, against the wife. (b)

Our courts of law have cognizance of matters of fraud ; and lately the Superior Court decided, in *Hoyt* v. *Maltby*, that where the obligee of a note was dead, and the obligor was administrator, and the note had been assigned, an action at law might be supported, in the

(b) 1 *Term Rep.* 5.

name of the assignee. So, where the obligor takes a discharge of a note from the obligee, who is a bankrupt, after notice of the assignment, an action at law lies against him. So, where there are two joint obligees, and one dies, and the other is a bankrupt, an action at law may now be brought against the executor of the deceased.

The rule, therefore, now is, that where nothing but money is sought, and common law proof needed, courts of law can give a remedy. And it is important, that the practice be uniform, and the decisions consistent. Our statute is positive, that if there be relief at law, chancery cannot interfere. In England, there has been a constant strife between the courts of law and chancery; and it has arisen to an enormous height. But these courts are there composed of different judges; but here, where the powers of both belong to the same judges, there surely can be no disposition, on the part of one, to encroach upon the bounds prescribed to the other.

*Ingersoll*, and *R. M. Sherman*, for the defendants in error.

The doctrine, in Great Britain, is, not that all contracts between husband and wife are to be established; but only such as are grounded on good consideration, and not productive of inconvenience to the parties. Thus, in *Beard* v. *Beard*, (c) the court refused to enforce an agreement, made by husband and wife, because it was unreasonable.

That a feme covert may, in England, have a separate

(c) 3 *Atk.* [72.]

maintenance, is a doctrine too clear to be denied, or even doubted. *Rutland* v. *Molineaux*, (*d*) and *Herbert* v. *Herbert*, (*e*) with a variety of other cases, might be produced ; but, it has been explicitly admitted.

Gifts by the husband, to the wife, are supported in equity ; and tho' a trustee is held to be necessary, (*f*) yet the husband is, *ipso facto*, trustee for the wife. And a wife has, in chancery, made her husband a party to a suit. (*g*)

It is said, that this is a modern doctrine, not known to the ancient common law ; but the case of *Rutland* v. *Molineaux* is an ancient case, and the doctrine an ancient doctrine, coeval with the English courts of equity.

It is also said to be impolitic to adopt the principles here ; that we have not arrived to that degree of luxury and refinement, to which they have in England ; that divorces *a mensâ et thoro*, and separate maintenances, are almost unknown. We do not contend for frequent divorces, nor for separate maintenances. But in this country, there are more of the middling class of people, who live separate, than in England ; and as to divorces, we have ten to their one.

Again, it is said, this will introduce controversies between husband and wife, which will be maintained in courts. But admit the wife's right to property, and she will require for it the same protection, that she now has for her person ; and no greater inconvenience will result from her going to law upon one subject, than upon the other.

(*d*) 2 *Ver.* 64.                    (*e*) *Prec. Ch.* 44.
(*f*) 1 *Font. Eq.* 92.              (*g*) 1 *Atk.* [278,] *Cecil* v. *Juxon.*

Shall we not then, adopt the English law upon the subject? Experience is our best guide; and more evils have arisen by departing from English rules, which applied to our situations, than have ever resulted from adopting them.

It seems to be admitted, that the justice of the case is with the defendant in error. But it is said, dangerous precedents have been established, by attending to the justice of a particular case, without attending to the effects of the principle. We, however, have the example of the English, who have not experienced the ill effects anticipated here. There are, indeed, evils, arising from decisions, by which they are shackled; such decisions our courts have wisely rejected; yet on this subject, we hear no complaints.

But the principle of a separate interest between husband and wife, has been recognized, by our own Courts, in the case of *Parsons* v. *Hosmer*. (h) And, in another case, (i) without attending to the English decisions so fully as we ought, it has been decided, that a married woman may devise her estate to her husband, without a power; and thus, a separate interest has been recognized.

When, therefore, we find the English rules so clear, and the justice of the case so apparent, and no rule of our own to oppose them; it is important, that their decisions be adopted here, as our common law, and that books, our only guide, should be followed.

But, we are told, that if we have any remedy, it is at

(h) 2 *Root.* 1.          (i) *Kellogg* v. *Adams* S. C. E. 1788.

law. Were we about to form a constitution, it might well be agitated, whether it were best to have courts of law and chancery in separate jurisdictions ; but the distinction has prevailed, ever since the settlement of this country. And as long as courts of chancery must exist, neither reason nor policy requires, that they should be deprived of part of their jurisdiction.

The line between courts of chancery and courts of law, is, that there are different modes of getting at the facts, and different relief. But, these are not the only instances, in which they differ ; our ancestors had the idea, that courts of chancery were to soften the rigour of the common law. The distinction prevails in Great Britain, and in this country, to this day.

Courts of law, previous to the existence of a court of chancery, adopted rules, from which they could not vary ; as in case of bonds with penalties, and forfeited mortgages. So, in case of a chose in action assigned, the interference of chancery has been found necessary, in this State ; our legislature having often refused to make notes negotiable.

In case of accident, as where a contract, by mistake of the scrivener, was drawn wrong, as in *Parsons* v. *Hosmer*, chancery has interfered, and must interfere. A court of law, in that case, would never have heard the testimony.

A number of cases have been decided, where money was the only object, and yet chancery interfered. (*j*)

All those rights, which have been born and nourished

(*j*) *Root, passim.*

in courts of equity, are still to remain there, unless the legislature see fit to remove them. Our statute gives chancery jurisdiction, where remedy cannot be had at law ; that is, where remedy could not *then* have been had at law.

If the principles, advanced by Lord MANSFIELD, in one case, (*k*) were to be adopted, we might, perhaps, have a remedy at law ; but that case is overset, by Lord KENYON, (*l*) who admits that relief may be had in a court of equity.

And what subject, ever more peculiarly required the assistance of a court of equity, than this ? At law, the wife could not controul a suit ; but the husband could, at any time, discharge it. It is no object for her to get an execution against the husband ; but upon a petition, a court of chancery can make such rules as are best calculated to secure the property, and can administer such a remedy, as would be most effectual.

*Daggett,* in reply.

It is important, that the bounds between courts of chancery, and courts of law, should be fixed, that the rule should be uniform. For several years past, we have been told, that where a man seeks nothing but money, and wants only common law proof, a court of law could grant him relief. So we were told, in *Backus* v. *Bacon,* and so, in *Hoyt* v. *Maltby.* If it should be decided, in this case, that a petition in chancery can be sustained, the judgments in those cases must be erroneous.

(*k*) *Corbett* v. *Poelnitz.*
(*l*) 8 *Term Rep.* 545, *Marshall* v. *Rutton.*

It is said, that courts of chancery sustain jurisdiction in cases of mortgages ; but they never do in any case, where remedy at law could be had. One class of petitions is to foreclose, the other is to redeem ; neither of which can be granted in a court of law.

The ground of interfering, in case of a mistake, is merely to supply testimony. Here, the ground taken is, that a court of law could not regard the contract, during the life of the husband, and, therefore, cannot, after his death. Is it meant by this, that the contract is void ? No ; but the remedy, it is said, must be the same after his death, as during his life. But, suppose this contract had been made, between this woman and a stranger, before the coverture ; would not the remedy have been different after the death of the husband, from what it was during his life ? Is not the suspension capable of being removed ? The argument, therefore, if it proves any thing, proves too much.

But, it is urged, that during the coverture, she might have gone into chancery, against her husband, upon this contract. " I will give you part of the avails of my bargain, when received," was the engagement on the part of the husband. But would a court of chancery sustain a petition against a husband, for the recovery of money? Can such an instance be shewn in Connecticut? (m)

The fate of this application ought to be the same, in a court of chancery, or a court of law.

It is agreed, that the ground for the interference of courts of chancery, in such cases, is general. When

(m) 2 Root 338, Willet v. Overton.

called upon to define the contracts to be enforced in chancery, between husband and wife, the counsel give the general reason, that *Powell* gives for enforcing all contracts in chancery. The amount of it, therefore, is, that chancery will enforce a contract between husband and wife, if they would have enforced the same contract, made by other persons, between whom there was no connection.

Upon this principle, the intervention of trustees is wholly unnecessary; equally idle is it, to call the husband a trustee. Upon this principle, the wife could enforce this contract, and procure an execution against her husband.

That a woman, under certain circumstances, may possess property, with which the husband shall have nothing to do, may be admitted; but that is not this case. This is nothing more than an agreement made with the wife, that if she will convey this property, the husband will pay her so much money.

A feme covert can take nothing, by gift, from the husband, (n) except by the custom of a particular place; and the principle established by the Court of King's Bench, in *Marshall* v. *Rutton*, oversets the doctrine contended for in this case.

How ridiculous is it, that the wife should recover property of the husband, and obtain execution, which, upon principles of the common law, he may destroy, as soon as it is obtained; or if he pays it with one hand, he may take it away with the other !

(n) *Co. Litt.* 112.

G g

1804.

DIBBLE
*v.*
HUTTON.

Separate maintenances, and agreements to separate, and convey property to the wife, for this purpose, have never been brought before our courts. How they would decide upon them is unknown. If they would declare a bond for such purpose to be void, the main support of this case is taken away.

In the case of *Slanning* v. *Style* (*o*) the *Chancellor* allowed the repayment out of the estate of the husband, either on the ground of a legal agreement, or implied contract. Upon such principles, the accounts of husband and wife are to be settled, as those of any neighbours, and they are merely copartners, and each may make contracts, without the other.

This case, then, either rests on contract, or on the equitable circumstances attending it. As to the first, are our courts ready to enforce a *contract* between husband and wife, when, if there is a clear principle of law, it is, that such contract can have no effect?

On the other ground, that the wife has sold her land, and the husband has received the avails, laying aside the promise, it follows, that in every case, where the husband has the benefit of the wife's real estate, she may have an action on the implied contract. And altho' in most cases, a consideration is paid to the wife, yet if a suit is brought after the death of the husband, his executor will be obliged to produce the evidence of such payment.

The judgment of the Superior Court was reversed, unanimously, HILLHOUSE, *Ast.* being absent.

(*o*) 3 *P. Wms.* 334.

BY THE COURT. The petitioner's claim, in her bill in chancery, rests on the ground of the husband and wife's contract, or a combined view of the facts contained in the bill. Hence, the questions made relate to the competency of a husband and wife to contract with each other ; the competency of the wife to have estate for her separate use ; and the equity of the particular case.

By the common law, the husband and wife are considered as one person in law, the existence of the wife being merged in that of the husband, or suspended during the coverture. As a consequence of this union of persons, the principles necessarily result, and have been established, that husband and wife cannot contract with each other, nor the husband make a grant or gift to the wife, nor the wife have personal estate, to her sole and separate use.

If these principles are to be received and applied, in their obvious import, to this claim, they, at once, determine all the questions, that arise in considering the case. They preclude the idea of the husband's and wife's competency to contract with each other, and the wife's competency to have, during *coverture*, personal estate to her separate use ; and these being precluded, no equity arises out of the facts in the case, which, consistently with those principles of the common law, can be recognized by a court of chancery. Nor, indeed, is any equity perceived to exist in this case, to distinguish it from the ordinary transaction of the wife's estate being sold, and the avails thereof coming, in personal estate, to the husband.

It is, however, insisted on, that those principles of the

common law have been qualified, and modified, in the courts of chancery, in England, in such manner, as to recognize the wife's right and competency to have personal estate, to her separate use, and the validity of certain contracts between husband and wife ; and that those qualifications and modifications, which have taken place in the English courts of chancery, ought to be adopted in ours.

The construction and principles, assumed by the English courts of chancery, on these subjects, are correctly stated. The important consideration is, whether they are to be incorporated into our chancery system.

In tracing the history of the English chancery, on this subject, it is found, that the doctrine of the wife's separate personal estate, a little more than a century past, since the emigration of our ancestors into this country, first insinuated itself into practice. It was not received without difficulty ; but it gradually gained ground, and soon introduced the principle of contract between husband and wife. Both have advanced, and been extended, till a system has grown up, widely different from the principles of the ancient common law, upon this point, and others arising out of the marriage relation.

It owes its rise to that state of manners and society, which it has followed, and accommodated.

By a kind of fiction, the husband is considered a trustee for the wife, as to her separate estate ; and, on the ground of its being trust estate, chancery has taken cognizance of it; and a husband and wife, have become suitors, and litigant parties, against each other, before the court.

The chancellor adapts the proceedings and decree of the court, to the intimate relation between the parties.

The principle, that governs with respect to contracts between husband and wife, does not appear to be definite. Some kinds of contracts are recognized and enforced, but a wide latitude is left for the discretionary power of the chancellor.

The system is complex, originating numerous, complicated questions, as to the relative rights and property of husband and wife, and changing the form of legal proceedings.

It is unnecessary to enter on a detail of those manners, different ranks, and general state of society in England, which induced the system; they greatly differ from ours.

At the time of the emigration of our ancestors from England, the principles of the common law, on this subject, were in full force, unqualified by the modifications of the court of chancery : they have ever been received and applied in their unqualified sense, both in our courts of law and chancery.

This is a case of novel impression; the maxims of the ancient common law, on this subject are plain and simple ; our state of manners and society do not require that they should be relaxed, or qualified. The principles, therefore, which govern in the English courts of chancery, ought not to engrafted into our chancery system ; but those of the common law remain unimpaired.