JOSEPHINE C. MATHEWSON *vs.* ALBERT H. MATHEWSON.

First Judicial District, Hartford, March Term, 1906.
TORRANCE, C. J., BALDWIN, HAMERSLEY, HALL and PRENTICE, Js.

The right to make a contract carries with it the right to maintain an action for its violation.

The legal status of husband and wife, which, with occasional modifications, had existed in this State for more than two hundred years, and the civil rights of each incident thereto, were fundamentally changed by chapter 114 of the Public Acts of 1877 (General Statutes, §§ 4545, 4546, 391, 392), commonly known as the Married Women's

· Act. Under its provisions the wife retains her legal identity, with capacity to acquire and own property, and with the right to make contracts and to sue and be sued.

By virtue of this Act a woman married since April 20th, 1877, may maintain an action at law against her husband for the recovery of money loaned.

Argued March 7th—decided April 17th, 1906.

ACTION by a wife against her husband to recover the amount of a promissory note given by him to her, brought to the Superior Court in Hartford County where the defendant filed a plea in abatement upon the ground of coverture, to which the plaintiff demurred; the court, *Reed, J.*, overruled the demurrer, whereupon the plaintiff answered, alleging a marriage between the parties subsequent to April 20th, 1877; a demurrer to this answer was sustained (*Ralph Wheeler, J.*) and judgment rendered for the defendant, from which the plaintiff appealed. *Error and cause remanded.*

*Joseph P. Tuttle,* for the appellant (plaintiff).

*Charles E. Perkins,* for the appellee (defendant).

HAMERSLEY, J. The plaintiff alleges that the defendant, for a valuable consideration, promised to pay her upon her demand a certain sum of money. The defendant, by his demurrer to the plaintiff's answer to the defendant's plea in abatement, in effect admits, for the purpose of determining the question of law in issue, that he did promise as alleged in the complaint, but claims that the plaintiff cannot maintain this action against him for the enforcement of that promise. It goes without saying, that if the parties had the right to make this contract, the plaintiff can sue the defendant for its breach unless such suit is clearly forbidden by some positive statute. "Wherever there is a valuable right and an injury to it, with consequent damage, the obligation is upon the law to devise and enforce such form and mode of redress as will make the most complete reparation."

*Foot* v. *Card*, 58 Conn. 1, 9, 18 Atl. 1027. The right to contract involves the right to sue for breach of contract, and when the law creates a new right to contract the mere creation of the right includes an appropriate remedy by suit for its violation. The defendant's claim, therefore, is manifestly wrong, unless he can maintain the proposition upon which he founds it, namely, that the parties had no power to make the contract alleged. It is not claimed that any disability attaches to the person of either of the parties. Each is of age and of sound mind. Each is capable of acquiring, owning and managing property. Each is capable of making lawful contracts with all persons and with each other, unless there is some law which prohibits any contract, or at least the contract alleged in the complaint, between this plaintiff and defendant.

It is admitted that the parties intermarried since April 20th, 1877, and the defendant contends that a law prohibiting any contract between the plaintiff and defendant is to be found in the law (including the Married Women's Act of April 20th, 1877) defining the civil status of husband and wife. For the purpose of avoiding confusion, we will first consider our law as it affects the status of married persons, without reference to the exceptions to the rule which have obtained in courts of equity in respect to those wives who have a separate estate.

The relation of husband and wife, although necessarily regulated by positive law, is not, like the relation of guardian and ward, created by that law. Like the relation of parent and child, it is the offspring of the law of nature, and these two relations constitute the family ; the family and the obligations and privileges pertaining to it reach back of all State regulations. *Payne's Appeal*, 65 Conn. 397, 402, 32 Atl. 948. The essential character of the relation of husband and wife as determined by the law of nature and the correlative rights and duties pertaining to it, may be developed, perverted, or confused, but cannot be destroyed, by the positive law which defines their legal status. The prevalent conception of the true nature of this relation may be affected

by and may affect the changing conditions of society, and may be affected by and may affect legislation defining the legal status. While legislation is ordinarily in accord with the notion of the true relation presumed to prevail at the time, it does not purport to create that relation. The rights and duties growing out of the natural relation are of a kind that must vary with changing circumstances, and of a nature in the main impracticable of enforcement through legislation. In defining the legal status of married persons the law determines the change in the civil rights of each wrought by the fact of marriage; the legal status thus established necessarily involves certain incidental rights which may or may not be expressed, and which may be established or altered by law without necessarily altering the status resulting from marriage. The primary and controlling change in legal status wrought by force of the marriage relates to the freedom of the person, but mainly to the capacity of owning property, and the incidents of the latter are the power of making contracts and of suing and being sued. In most English speaking communities, by the law as first established, the wife by force of the marriage lost her legal identity and the capacity of owning property, and as incident to this she lost the power of making contracts and of suing and being sued. But by the law as now generally established she does not by force of the marriage lose her legal identity nor the capacity of owning property, and does not lose the civil rights incident to this capacity. This change in status has been accomplished in different ways and more or less gradually. In Connecticut, perhaps more fully than elsewhere, it has been accomplished by a single radical Act of legislation, directly reversing the former primary and controlling change in legal status affected by force of the marriage, and such radical change more clearly involves a consequent change in the civil rights purely incidental to the status. This consequent effect upon incidental rights plainly comes within the rule that where the reason of the law fails, the law ceases to operate. *Foot* v. *Card*, 58 Conn. 1, 18 Atl. 1027 ; *Hart* v. *Knapp*, 76 Conn. 135, 139, 55 Atl. 1021.

By our first legislation it was enacted that justice should be administered according to the laws of this jurisdiction, " and for want thereof according to the rule of the Word of God." 1 Col. Rec. pp. 21, 509; Rev. 1672, Preface; *Fitch* v. *Brainerd*, 2 Day, 163, 190, 193, 194. By this law, first enacted in 1637–8, the wife's legal identity by force of the marriage became merged in that of her husband, and her legal capacity to own or acquire property, real as well as personal, was lost; by force of the marriage her personal freedom was subjected to the will or control of the husband. Until the reign of Charles II, the right of a husband to correct his wife was recognized (1 Bl. Comm. 444); and until comparatively recent times the right of the husband to restrain the person of his wife by confinement, for the purpose of securing her obedience, was recognized. The law which attached such subjection to the legal status of a married woman has been abolished, but not by direct legislation; it has disappeared under the continuous pressure of judicial interpretation or indirect legislation. The law, however, which attached to the status of a married woman an incapacity to own property, with the consequent inability to make contracts and to sue or be sued, remained unchanged in theory until 1877. In 1672 an Act secured to the wife who survived her husband the right to a life estate in one third of the land of which he stood possessed in his own right at the time of his death, a right analagous to, but distinctly different from, the English law of dower. See Rev. 1750, p. 44. In 1723 the law of status by which a husband acquired upon marriage an absolute right to his wife's lands as well as to her personal property, was altered so as to correspond more closely to the English common law. The wife's property in land was suspended during coverture, and a usufructuary estate only vested in the husband. In analogy to the English process of conveying land by a fine, a wife was authorized by a deed in which her husband joined, executed in the manner prescribed, to make valid conveyance of her land, and such particular conveyance was the only act in the nature of a contract within her capacity. 6 Col. Rec.

p. 425.   In 1809 an Act gave to married women the right to
dispose of their estates, real and personal, by will in the
same manner as other persons.   Rev. 1821, p. 199, § 1.   In
1849 it was enacted that personal property accruing, after
the passage of the Act, to a husband in right of his wife,
should be held by him in analogy to his estate in her land;
the title to such property vested in him as trustee, but dur-
ing his life he owned the proceeds and income absolutely ;
upon his death, as in the case of land, an absolute estate
vested in the wife or those legally entitled to succeed.   Cer-
tain provisions for protecting such personal property from
waste while in his possession necessarily enlarged in some
particulars the legal capacity of the wife.   As originally
passed, the Act only applied to property accruing to a man
in right of his wife by virtue of bequest or distribution to
her.   In 1856 the provisions were extended to property de-
rived from patents, copyrights, etc.   In 1857 its provisions
were extended to property accruing by any gift to a wife
except from her husband ; and in 1866 the provisions were
extended to all property accruing in any way to a married
woman subsequent to 1849, and to all property belonging at
the time of marriage to any woman married since 1849.
Rev. 1866, p. 303.

The legislation above mentioned includes our laws defin-
ing the legal status of married persons from 1637–8 to 1877,
unless, possibly, an Act passed in 1865 by which a husband
was released from liability for his wife's antenuptial debts,
and for such debts the wife was made liable to be sued as a
*feme sole*.   The original law, declaring that marriage works
a merger of legal identity of wife in that of husband, and the
incapacity of holding property during coverture with the
consequent inability to contract, remained unchanged ; but
the transfer, by operation of the marriage, of the property
of the wife to the husband, was modified in 1723 as to real
estate, by limiting his ownership to a usufructuary or life
estate ; and from 1849 to 1866 a similar modification was
made as to his ownership of personal property.

In courts of chancery, however, in dealing with property

held under a trust for the sole and separate benefit of a wife, and called her separate estate, the legal status of such wife was for practical purposes substantially ignored.    When the practice commenced in England of making marriage settlements by which certain property was conveyed to trustees upon varying trusts, and quite frequently upon the trust to hold the property for the sole and separate benefit of the wife, and to dispose of the same, principal and income, in pursuance of her directions, the chancellor assumed jurisdiction of such trust or separate estate of the wife.    In the beginning the chancellor was frequently a churchman, familiar with the civil law largely followed in ecclesiastical courts, and the rule of the civil law which considered the husband and wife as two distinct persons, who might have separate estates, contracts, debts and injuries, influenced the court of chancery in administering the separate estate of the wife; 1 Bl. Comm. 444 and note (47) ; and in that court, in dealing with the wife's separate estate, the separate identity of husband and wife, the equal capacity of owning property, the consequent power of making contracts, whether between themselves or with others, was recognized ; a commensurate right to sue and liability to be sued followed.    But all proceedings in equity were modified by the fact that, outside a court of equity and for every purpose except the administration in chancery of this trust estate, the wife's legal identity was lost in that of her husband, and she had no separate capacity of owning property and power of contracting ; and so, although her contracts might be binding upon her in equity and she might be sued for their enforcement, yet, as in law (and in this particular equity followed the law), the custody of her person and the value of her services belonged to her husband, and the prevalent mode of enforcing payment of debt by imprisonment could not in her case be followed without depriving him of these marital rights ; therefore no personal judgment could be rendered against her, and equity, in a suit against her upon a debt contracted by her—as upon a bond executed by her as surety for her husband's indebtedness—was for this reason limited to a judgment appropriat-

ing her separate property to the satisfaction of such obligation. *Hulme* v. *Tenant,* 1 Bro. C. C. 16 ; *Corbett* v. *Poelnitz,* 1 Term, 5 ; Reeve on Dom. Rel. 164, 171. This equitable jurisdiction, with its recognition of the separate identity and equal capacity of husband and wife, was extended from separate property secured by marriage settlement to all property in any way devoted to the separate use of the wife ; and when a conveyance, a gift of such property, named no trustees, by operation of law the bare legal title was held to be vested in the husband as trustee. Reeve on Dom. Rel. 163.

In Connecticut, prior to about 1780, marriage settlements were unused, and the English common law, which recognized and administered in chancery separate estates of married women, was regarded as inapplicable to our condition and with great disfavor. *Dibble* v. *Hutton,* 1 Day, 221, 236, 237 ; *Butler* v. *Buckingham,* 5 id. 492, 496, 505. But in *Imlay* v. *Huntington,* 20 Conn. 146, the whole subject of separate estate was thoroughly discussed by this court in an opinion delivered by the late CHIEF JUSTICE STORRS, in the first case in which the power of married women to dispose of property reserved to their use arose in our courts. We affirmed our common law in respect to the separate estate of married women, and held that the jurisdiction of equity in the administration of such separate estate was in substantial accord with the common law of England ; also that a married woman, incidental to her ownership of such estate, had the power of disposing of the property, and must be regarded in equity as a *feme sole* in respect to her right of disposing of said property, and that it was competent for her to exercise such right in favor of her husband ; and this power of a married woman in equity over her separate estate we subsequently described as " complete dominion." *Harris* v. *Spencer,* 71 Conn. 233, 237, 41 Atl. 773. *Imlay* v. *Huntington* was decided in 1849, and the legislature immediately extended the justice accorded to married women in courts of equity, by providing that the following classes of property, subsequently acquired, should be the separate estate

Mathewson v. Mathewson.

of the wife, that is, the bare legal title in the husband as trustee, and in equity complete dominion in the wife over the property: property acquired by personal services of the wife (1860); land conveyed to the wife for property so acquired (1850); personal property acquired by wife during abandonment by her husband (1850); avails of wife's land invested for her benefit (1850); certain policies of insurance (1850); all a wife's property upon a defined abandonment by her husband (1853).

(In 1878 it was enacted that "all property hereafter acquired by any married woman shall be held by her to her sole and separate use." Public Acts of 1878, p. 300, Chap. 61. The meaning of this Act is doubtful. It may have been intended in broad terms to secure to women married before 1877 some of the rights in equity which by the Act of 1877 were secured in law to all women subsequently married. For some reason it was repealed in 1882 [Public Acts of 1882, p. 122, Chap. 7] perhaps because it was regarded as unnecessary or as liable to produce confusion, or obnoxious as an interference with vested rights.)

In 1877, therefore, the law defining the legal status of married persons stood thus: By force of the marriage the husband acquired a life estate (under some circumstances during the wife's life only) in all property, real or personal, then owned or subsequently acquired by the wife; he acquired the control of the fee or reversion of all this property, so that it could not be disposed of without his consent; he retained his own legal identity, the absolute ownership and control of his own property, and all the civil rights and powers belonging to an unmarried man; but by reason of the merger of the wife's legal identity in his own, he could not contract with her. He became legally charged (so far as they might be enforced through law) with those duties of affection and support inherent to the relation of man and wife. By force of the marriage the wife acquired a right to support by her husband, but no right to charge his estate with this support unless through an agency, real or fictitious; her capacity to own or acquire property became suspended;

the management, income and profits of her property vested solely in her husband; her legal identity was lost in his, and therefore she had no power to make a contract with any one, except a contract of necessity by which she might, with consent of her husband, dispose of the fee or reversion of her property, and, like him, she became legally charged with the duties of affection and assistance inherent to the marriage relation. When, however, the beneficial interest in property came to a married woman under the protection of a trustee, her rights in respect to such property came within the jurisdiction of equity, and in entering that court, in pursuance of that jurisdiction, man and wife alike dropped the legal status, and the incidents flowing from that status ceased to exist. In equity they were not one person, but two distinct persons, each capable of owning, enjoying and disposing of property within equity jurisdiction, and consequently each capable, within that jurisdiction, of making contracts with all the world and with each other, and of suing and being sued.

The quasi-equitable status recognized in courts of equity remains, within its prescribed and rapidly lessening limits, substantially unchanged. The foundation of the legal status, namely, the unity in the husband of his own and his wife's legal identity and capacity to own property, was removed, and a new foundation, namely, equality of husband and wife in legal identity and capacity of owning property, was laid by the Act which took effect April 20th, 1877. Public Acts of 1877, p. 211; Rev. of 1902, §§ 4545, 4546, 391, 392. This legislation is remedial, not as ameliorating an existing evil but as eradicating that evil. It is in the nature of fundamental legislation, involving all the results necessarily flowing from the principle established. The equal capacity to own property and the equal legal identity, necessarily involves an equal power of making contracts and a power of contracting with each other. Such result has followed a similar radical change in other jurisdictions. *May* v. *May,* 9 Neb. 16, 2 N. W. 221; *Wilson* v. *Wilson,* 36 Cal. 447; *Harrell* v. *Harrell,* 117 Ind. 94, 19 N. E. 621; *Wilson* v.

*Wilson*, 113 Ind. 415, 15 N. E. 513 ; *Hamilton* v. *Hamilton*, 89 Ill. 349 ; *Bea* v. *People*, 101 Ill. App. 132 ; *Clark* v. *Clark*, 49 id. 163 ; *Thomas* v. *Mueller*, 106 Ill. 36 ; *Snell* v. *Snell*, 123 id. 403, 14 N. E. 684 ; *Going* v. *Orns*, 8 Kan. 85 ; *Crater* v. *Crater*, 118 Ind. 521, 21 N. E. 290 ; *Wood* v. *Wood*, 83 N. Y. 575 ; *Minier* v. *Minier*, 4 Lans. (N. Y.) 421 ; *White* v. *White*, 58 Mich. 546, 25 N. W. 490 ; *Howland* v. *Howland*, 20 Hun (N. Y.) 472 ; *McKendry* v. *McKendry*, 131 Pa. St. 24, 18 Atl. 1078 ; *Small* v. *Small*, 129 Pa. St. 366, 18 Atl. 497. In the cases cited, and others that might be cited, the courts differ somewhat in the application of the rule, owing mainly to the different legislative processes by which the change in status has been partially or fully accomplished ; but all are consistent with the unquestionable proposition that where the unity of legal identity and property in the husband has been replaced by the equality of each in legal identity and ownership of property, the power of contracting with others and with each other is a necessary consequence.

The precise question before us has never been directly passed upon by this court. In *Walko* v. *Walko*, 64 Conn. 74, 76, 29 Atl. 243, we treated the question as an open one, but in several cases we have more or less plainly indicated the truth of the proposition above stated. *Warren* v. *Clemence*, 44 Conn. 308 ; *Adams* v. *Adams*, 51 Conn. 135, 136 ; *Spitz's Appeal*, 56 Conn. 184, 186, 14 Atl. 776 ; *Corr's Appeal*, 62 Conn. 403, 409, 26 Atl. 478 ; *Williams* v. *King*, 43 Conn. 569 ; *Wells* v. *Cooper*, 57 Conn. 52, 57, 17 Atl. 281 ; *Freeman's Appeal*, 68 Conn. 533, 538, 37 Atl. 420 ; *Belden* v. *Sedgwick*, 68 Conn. 560, 37 Atl. 417 ; *Baxter* v. *Camp*, 71 Conn. 245, 41 Atl. 803 ; *Harris* v. *Spencer*, 71 Conn. 233, 237, 41 Atl. 773 ; *Cunningham* v. *Cunningham*, 72 Conn. 157, 159, 44 Atl. 41 ; *Clarke* v. *Black*, 78 Conn. 467, 473, 62 Atl. 757.

In *Fitzmaurice* v. *Buck*, 77 Conn. 390, 393, 59 Atl. 415, we comment on the radical change in public policy introduced by the reform Act of 1877. The completeness of this change cannot be questioned. The Act in the clearest

terms declares that equality in personal identity and in the ownership of property shall replace the unity of all rights in the husband, as the legal status effected by intermarriage. Before marriage man and woman stand, in respect to ownership of property and rights of disposition, equal. Section 1 declares that intermarriage shall not affect this equality; that by force of the marriage " neither husband nor wife shall acquire . . . any right to or interest in any property held by the other before the marriage, or acquired after the marriage." Section 2 declares their equality in obligations incurred by each, and equality in the subjection of the property of each to liability for the performance of the duties of support and assistance each assumes by the intermarriage. It declares that all purchases made by either shall be presumed, in absence of notice to the contrary, to be on his or her private account and liability, but that each shall be liable for any article purchased by either which shall have gone to the support of the family, as well as for the necessary services of a physician and the rent of a necessary residence (Amendment, Public Acts of 1903, p. 8, Chap. 9). Section 3 declares the equality of each in property rights secured to the survivor upon the death of the other. By force of the marriage husband and wife alike acquire an absolute interest, which cannot be taken away by any testamentary disposition, in a prescribed portion of all property, real and personal, legally or equitably owned by the other at the time of his or her death. Section 4 declares the equality of each in the manner by which the interest of the survivor in the estate of the other may be altered by contract or lost by misconduct during the marriage. The application of the legal status thus established to persons previously married, was questionable as an unwarranted disturbance of vested rights; but § 5 declares that this legal status is made—so far as it can be by legislative action—the status of all married persons within our jurisdiction, by providing that all persons previously married may, during marriage, enter into a contract with each other, and upon the execution and recording of that

contract shall have the legal status established by the Act; and § 6 declares the completeness of the legal status thus established, based upon the equality of husband and wife in all the property rights and interests during marriage and upon its termination by death, and the complete substitution of this status for that previously existing, in providing that all existing statutes giving to either husband or wife any rights or interests in the property of the other, either during marriage or after the death of either, other than those involved in the new status established by the Act, shall be repealed.

We think that in enacting this law the State adopted a fundamental change of public policy; that the new legal status established for married persons by the Act was based upon and must be administered in accordance with this policy; that in every marriage contracted since April 20th, 1877, husband and wife alike retain the capacity of owning, acquiring and disposing of property, which belongs to unmarried persons; that the power of contracting, incident to such capacity, necessarily follows, and that the legal status of husband and wife involves the capacity to contract with each other and with others. Under the law of status which the Act of 1877 abolished, the wife could not contract with her husband or any one else, because her legal identity and capacity of owning property attached to the husband, and for the same reason the husband could not contract with his wife. But in courts of equity, where for the purpose of exercising a peculiar jurisdiction a sort of equitable status has been recognized closely analagous to the legal status established by the Act of 1877, the right of each to contract with the other, as well as with all other persons, has been held in a long line of decisions to be necessarily consequent to the separate identity of each and the capacity of each to own property. When, therefore, this equitable status was taken as a model upon which the legal status established in 1877 was framed, the right of husband and wife to contract with each other and with others necessarily followed, not

only upon principle, but also by force of an overwhelming weight of authority; and this right cannot be restricted unless by some legislative Act. Following the declaration, in § 1 of the Act, of the absolute equality of husband and wife in the ownership of property, is a recital of some of the consequent results—the separate earnings of the wife shall be her sole property, the wife shall have power to make contracts with third persons and to convey to them her real and personal estate as if unmarried, her property shall be liable for her debts but not for the debts of the husband, and the husband shall not be liable for the debts of the wife. Every one of the results detailed followed as a necessary consequence of the legal status established by the Act, and the recital of them, although not unnatural, was unnecessary. It is claimed that because the consequent power of the wife to make contracts with third parties is recited and the consequent power to make contracts with each other is not recited, that therefore the latter consequent power is prohibited. The claim is, that when an Act abolishes a legal status and establishes a new and contradictory status, a recital in the Act of some of the results necessarily following the status established is equivalent to legislative prohibition of all the results not recited.

We think this claim is untenable. By a parity of reasoning, the Act prohibits the wife from suing and being sued, for this consequent result is not among those recited in the Act. In an Act which, leaving the foundation of marriage status unchanged, merely provides certain exceptions to the necessary consequences of that status, such exceptions might properly be limited by the necessary import of the language used in describing them; and, for a similar reason, an Act which changes the foundation of the status necessarily involves the consequences of the new status and not those of the old, and these consequences cannot be prohibited by inference unless the inference of prohibition is necessary.

Our conclusion is, that by force of the legal status of married persons established in 1877, each party to a mar-

riage retains his or her legal identity and capacity of owning property belonging to him or her at the time of marriage, each has the power of contracting, and each may sue or be sued for a breach of contract at law or in equity, according to the nature of the relief sought. It is doubtless true that, by reason of the marriage relation, some events which, as between unmarried persons would give rise to a cause of action, would not as between man and wife have the same effect. The nature of such events, should the question arise, must be determined in view of the public policy upon which our legislation of 1877 was based, and not in view of the policy recognized in our legislation of nearly three centuries ago. It is sufficient for the disposition of this case to say that such possible events do not include a contract, upon valuable consideration, to pay a certain sum of money, and a breach of that contract.

It may be that the action of the trial court in overruling the plaintiff's demurrer to the defendant's plea alleging a marriage is sustainable under existing rules of practice in pleading, but that question is now immaterial. The plaintiff has answered, alleging that the marriage mentioned in the plea took place since April 20th, 1877, and this allegation, if true, is a sufficient answer to the plea. The defendant's demurrer to the answer should, therefore, have been overruled.

There is error; the judgment of the Superior Court is reversed and the cause remanded for further proceedings according to law.

In this opinion the other judges concurred.