WALTER M. LEITH AND ANN LEITH, HIS WIFE, PLAIN-
TIFFS-APPELLANTS, v. ANDREW B. HORGAN, DE-
FENDANT-RESPONDENT.

Argued September 14, 1953—Decided November 2, 1953.

*Mr. Frank B. Bozza* argued the cause for appellants.

*Mr. Charles S. Barrett, Jr.,* argued the cause for respondents (*Messrs. Lum, Fairlie & Foster,* attorneys).

The opinion of the court was delivered by

HEHER, J. Plaintiffs invoke the jurisdiction of Chancery for the enforcement of what they conceive to be their "right of visitation" to their invalid daughter Marion, the wife of defendant Horgan, and for the appointment of a guardian "to safeguard the interest and welfare" of Marion and "to facilitate" plaintiffs' asserted right of visitation.

Without mutual forbearance in the interest of the afflicted, as well as the peace of mind and soul that is dearer than all, the deep bitterness engendered by a family tragedy will intensify its grievousness and poignancy and dim the light of faith and hope in a crisis that calls for the finest spiritual qualities. It is indeed a time for the charity that suffereth long and is kind, and beareth and endureth all things.

Defendant and Marion were married September 21, 1935. They have five children, all boys ranging in age from 15 to 2½ years. On May 27, 1950, at about 1:30 A. M., Marion was found in an unconscious state on the floor outside the bedroom she and her husband occupied, at the landing of the staircase leading to the first floor of their residence No. 212 Ocean Road, in Spring Lake, New Jersey, plaintiffs' house rented to the Horgans. She was removed to the Fitkin Memorial Hospital a few miles away, and was there found to have suffered a cerebral hemorrhage and a right hemiplegia,

accompanied by complete motor aphasia and partial sensory aphasia. There is medical opinion that the cerebral lesion was traumatic in origin, the result of a fall. There were four brain operations in all, primarily for a subtemporal decompression and the removal of a cranial clot, but the patient has ever since been totally disabled; efforts at rehabilitation have not met with marked success. Yet she has full mental competence.

Marion remained at the Fitkin Hospital until Thanksgiving Day of 1950, when she was removed to St. Mary's Hospital in Orange, New Jersey, where she remained until February 12, 1951. She was then taken to the Crippled Children's Hospital in Newark, New Jersey, and following treatment there she was placed in a nursing home, but after a time, as the result of mounting tensions in defendant's relations with her parents, she was removed to another nursing home, not disclosed to plaintiffs, and ever since defendant has concealed her whereabouts. Plaintiffs' insistent demands for access to their daughter have been rebuffed.

Amicable family relations turned to loathing and hatred after the unfortunate mishap to Marion, due to the belief harboured by plaintiffs that their daughter's condition was the result of violence at the hands of defendant, a grievously mistaken notion so far as the evidence goes, and defendant's resentment of the reiterated criminations. These emotional reactions eventually obscured the realities and led to fanciful and wholly imaginative grievances and retaliatory acts and the ultimate flight of reason and judgment.

In this impasse, and in the avowed interest of Marion, who reciprocated their love and affection, and to alleviate her distraught physical and mental condition as well as their own anxiety, the plaintiff parents sued out a writ of *habeas corpus* to release her from what was alleged to be "imprisonment or confinement" at an "unknown place, * * * against her will," made possible by her physical disability.

The complaint in that proceeding stated that, although the Law Division of the Superior Court had power under

*R. S.* 2:81–1 *et seq.* to allow the writ of *habeas corpus,* plaintiffs invoked the "inherent jurisdiction" of Chancery to liberate Marion, "for whose relief the writ is intended," from her "illegal imprisonment, restraint and confinement." It was also alleged that Marion was not receiving adequate rehabilitative treatment.

The writ issued, and there was a return denying that Marion was under "restraint against her will," and alleging the provision of adequate medical, surgical and nursing care, the unfitness of the parents for "any custody" of Marion, and that defendant "cannot produce" her in court, "for to do so would endanger her life and health."

Judge Proctor, accompanied by Dr. Harold M. Somberg, whom he "appointed as a witness for the court," journeyed to the nursing home where Marion was then undergoing treatment. The physician concluded, after interrogating Marion, and Judge Proctor concurred, that "it would be most detrimental" to her "physical condition" were she "brought into this court or any other court," and that "she should not be subjected to any questioning by lawyers." He testified that Marion was mentally competent, was aware of her surroundings, and "knew what she was doing," although she was not told of "any court proceedings," and that she said "she loved her husband and her children and she wanted to see her husband," but was "emphatic in saying that she did not wish to see her mother and father at this time." Judge Proctor, however, was not entirely certain that Marion used the qualifying phrase "at this time." He was persuaded by the evidence that she had had "some neuroses" prior to the day of her injury, but he had no way of knowing whether "it was of any serious consequence except it might have been a forerunner of these hemorrhages she suffered later, but she did have a fear that something was going to happen to her and she had a fear of choking." There was evidence of filial love and affection. There is no suggestion of an estrangement between parents and daughter.

Judge Proctor found that defendant had "always been a devoted and faithful husband and father," and had "done

all within his power for the best interest of his wife"; and he acquitted him of the imputations of violence. There was no evidence whatever to sustain that charge. And, while convinced of the parents' love for their daughter, he deemed that an irrelevant consideration; the inquiry, he said, was whether Marion was "illegally restrained," and he concluded that she was not, in view of her declaration to Dr. Somberg that she did not wish to see her "father and mother," and therefore the writ must be dismissed.

And the judge then observed that "emotional disturbances" no doubt accounted for the unseemly behaviour, but there was no doubt of the parents' great love for their child; and he expressed the hope that the parents from that time on would abstain from provocative conduct and defendant would "have the goodness to permit the mother and the father, or both, to see their daughter." He adverted to defendant's concession on the witness stand that, "regardless of his own feelings," he would permit his wife to "see her mother or father," if such was her wish, "particularly as to the mother." Assuming the existence of the power to do more to this end, the judge said he could not exercise it in view of Dr. Somberg's testimony that "it would be emotionally upsetting" to Marion and "damaging to her if she saw" her parents "at this time," her welfare being the paramount consideration, and for that reason also he was obliged to dismiss the writ.

In the present proceeding there was summary judgment for defendant on the ground that since the prior judgment on *habeas corpus* was predicated on the finding that Marion did not wish to see her parents, and there was no showing of a "change in the situation from that which was presented to Judge Proctor," i. e. "the mental attitude of the wife," the doctrine of *res judicata* served to bar this action as one to enforce the parents' "right of visitation."

The rationale of the judgment of the Appellate Division is that the husband is the "nearest kin" to his wife, and as such "has the responsibility for the care and protection of his wife," the greater in this case because of "the helplessness of" the wife; and that if the wife "were in normal

health, she herself would decide to receive or not to receive her parents," but "paralyzed and helpless as she is, her husband must make the decision," and her parents "are without legal right to visit" her "and can obtain no relief in this cause." This was not deemed to be an absolute rule, applicable under any and all circumstances. It was intimated that the parents would have such access were it made to appear that the daughter "needed their ministrations," but the case made by the complaint was not in this category and, at all events, there was no allegation that Marion "is confined or constrained by her husband against her will."

## I.

██ The principle of *res judicata* is not operative to bar this proceeding. The judgment dismissing the writ of *habeas corpus* is not conclusive of the issue raised here. The object of the first proceeding, as assessed by Judge Proctor, was simply to determine whether Marion was "illegally restrained"; here, her parents assert the right of visitation, in their own interest as well as hers, depending upon her wishes and personal welfare, wherein invalidism fetters freedom of action and expression. At common law, denial of the writ of *habeas corpus* is generally not conclusive under the doctrine of *res judicata*, although the action taken in the prior proceeding may well be considered in determining whether the relator's second application constitutes an abuse of the process. *State v. Brearly*, 5 *N. J. L.* 639 (*Sup. Ct.* 1819) ; *Waley v. Johnston*, 316 *U. S.* 101, 62 *S. Ct.* 964, 86 *L. Ed.* 1302 (1941) ; *Salinger v. Loisel*, 265 *U. S.* 224, 44 *S. Ct.* 519, 68 *L. Ed.* 989 (1924) ; *Wong Doo v. United States*, 265 *U. S.* 239, 44 *S. Ct.* 524, 68 *L. Ed.* 999 (1924) ; *State. ex rel. Shapiro v. Wall*, 187 *Minn.* 246, 244 *N. W.* 811, 85 *A. L. R.* 114 (*Sup. Ct.* 1932). Where the writ of *habeas corpus* is used for its primary purpose of resolving the legality of the restraint imposed upon one who has been deprived of his liberty, the rule of *res judicata* has no application. *Sheehy v. Sheehy*, 88 *N. H.* 223, 186 *A.* 1, 107 *A. L. R.* 635

(*Sup. Ct.* 1936). Where, for instance, *habeas corpus* is not invoked as a writ of liberty in the original sense of the term, but only indirectly and theoretically as such, as a means of settling the rights of conflicting claimants to the care and custody of a minor child, the doctrine of *res judicata* is generally applied, if no material change of circumstances is shown, or, stated more accurately, the writ will not be granted as a matter of right. *Sheehy v. Sheehy, supra.*

Certainly, where there has been a material change of fact or circumstance, or the subsequent proceeding has a substantially different design, *e. g.*, to enforce the essentially humane right of visitation in the common interest of parents and an invalid daughter, even though the child be married and cohabiting with her spouse, the order dismissing the writ of *habeas corpus* is not in right reason or justice pleadable in bar. Compare *People ex rel. Fahey v. Burr*, 316 *Ill.* 166, 147 *N. E.* 47 (*Sup. Ct.* 1925). Here, it is shown that ever since the dismissal of the writ of *habeas corpus*, defendant has concealed from the plaintiff parents the whereabouts of their child, and has denied them all access to her, thus precluding the parents from making known her current situation and circumstances. It would be a plain subversion of the principle if the rule of *res judicata* were applied in these circumstances.

## II.

Parents and their married daughter living with her spouse are not without the mutual right of intercourse, save in circumstances where converse and association would jeopardize the marital relation. It is a natural right grounded in the strongest ties of blood. A wife's obligation is to her husband first; but communion with her parents not exceeding the bounds of reason cannot reasonably be deemed a deviation from marital duty. Marital well-being depends upon mutual forbearance and concessions to emotional yearnings and aspirations founded in the natural law and humanitarian promptings and impulses. "Humanity is the second virtue of Courts, but, undoubtedly, the first is justice."

*Evans v. Evans*, 1 *Consistorial Rep.* 35, 36, 161 *Eng. Reprint*, 466 (1790).

By marriage, the husband and wife at common law become one person: that is, "the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband: under whose wing, protection, and *cover*, she performs everything; * * * and her condition during her marriage is called her *coverture*." 1 *Blackstone's Com.* 442; *Den v. Hardenbergh*, 10 *N. J. L.* 42, 43 (*Sup. Ct.* 1828).

This common-law unity of husband and wife is at once a natural and legal relationship giving rise to reciprocal rights and duties that vary with changing circumstances, and in their nature are sometimes impracticable of enforcement by positive law, although in the main the positive law of husband and wife is in accord with the prevalent conception of the true character of the relation, influenced by social ideals and standards. *Mathewson v. Mathewson*, 79 *Conn.* 23, 63 *A.* 285, 5 *L. R. A., N. S.*, 611 (*Sup. Ct. Err.* 1906). But in equity, for many purposes, the husband and wife as in the civil law are treated as distinct persons, the wife capable of having her own interests in limited spheres not at variance with the essential family obligations. *Arundell v. Phipps*, 10 *Ves.* 139, 32 *Eng. Reprint* 797 (1804); *Livingston v. Livingston*, 2 *Johns. Chan.* 539 (1817); *Story's Equity Jurisprudence* (11th ed.), sec. 1367, 1368.

The evolution of society has introduced new concepts and ideals as to the correlative rights and duties arising out of the marriage relation that radically modify the common-law theory of marital unity. *Bacon's Abridgement*, title *Baron and Feme*, (*B*), says that "the husband hath by law power and dominion over his wife, and may keep her by force, within the bounds of duty, and may beat her, but not in a violent or cruel manner." In the case of *Rex v. Lister*, 1 *Str.* 478, 93 *Eng. Rep.* (*Full Repr.*) 645, decided in 1721, it was held that the husband may restrain his wife for certain reasons, such as that she is dissipating his estate and con-

sorting with incontinent and unchaste company, and these are the only grounds on which he may restrain her. There, by a deed of separation some part of the wife's fortune was made over to the husband, and the rest settled for her separate maintenance; after a time the husband seized the wife, as she came out of church, and hurried her away to a remote place, where he kept her under guard till her relations found her and brought a *habeas corpus.* The husband declared he took her into his power in order to prevail with her to part with some of her separate maintenance; the holding was that "where the wife will make an undue use of her liberty, either by squandering away the husband's estate, or going into lewd company, it is lawful for the husband, in order to preserve his honour and estate, to lay such a wife under a restraint"; but "where nothing of that appears, he cannot justify the depriving her of her liberty: that there was no colour for what he did in this case, there being a separation by consent."

And in *Anne Gregory's Case,* 4 *Burr.* 1991, 98 *Eng. Reprint,* 38 (1766), the wife had been ill-used by her husband, and had fled from him to her mother and uncle, for security and protection. On *habeas corpus,* by the husband, the court would not deliver her to him, but told her she was at liberty to go where she pleased, and, at her request, gave her a tipstaff to secure her against insult on her return to her friends. In *Rex v. Mead,* 1 *Burr,* 542, 97 *Eng. Reprint* 440 (1758), Lord Mansfield stated the then general rule thus: "The husband has, in consequence of his marriage, a right to the custody of his wife, and whoever detains her from him, violates that right, and he has a right to seize her wherever he finds her."

In 1840, in a case where the wife had absented herself from her husband, and resided away from him for a considerable time; and he enticed her back by stratagem, and kept her in confinement in his house upon her threat to leave him again at the earliest opportunity, Coleridge, J. said: "For the happiness and the honour of both parties," the law "places the wife under the guardianship of the husband,

and entitles him, for the sake of both, to protect her from the danger of unrestrained intercourse with the world, by enforcing cohabitation and a common residence." *In re Cochrane*, 8 *Dowl.* 630, 636. It was there adjudged that in the circumstances the husband was entitled to detain his wife, and even to use force for the purpose, provided he used no unnecessary violence, and imposed no unnecessary constraint—a holding that would seem to be in conflict with the principle of the prior case of *Rex v. Lister*, cited *supra.* The authority of the *Cochrane* case was further weakened by *Reg. v. Leggatt*, 18 *Q. B.* 781 (1852), where Lord Campbell ruled that a husband has no such right to the custody of his wife as a parent has to the custody of his child. And in the later case of *Reg. v. Jackson*, 1 *Q. B.* 671 (1891), the *Cochrane* case was to all intents and purposes overruled. The cases are factually similar, save that in the *Jackson* case the husband used force to accomplish what in the *Cochrane* case was had by stratagem. It was held in the *Jackson* case that if a wife chose to absent herself from her husband, there was no right in the husband to capture her, and any case affirming the right to detain her ought to be overruled.

█ In this country, quite apart from the enabling Married Women's Acts, the law has kept pace with the historical development in England of the rights, responsibilities and privileges of the marriage relation. The husband is still the head of the family, but there is no longer the almost complete dependency of the wife as at common law, mistakenly referred to in some of the cases as a condition of servitude. Even at common law a wife is not the servant of her husband, but rather his helpmeet in the superintendence and direction of family affairs and sharer of his authority in relation to matters peculiarly within her province. The enlightened jurisprudence of the present day accords to the wife in full measure the equality and dignity that are hers of natural right as the mistress of the family, and the freedom, privileges and prerogatives in keeping with her exalted station—such as are incompatible with the notion of subordination to a degree interdicting intercourse with her parents

and kinsfolk, unless in the special circumstances their exercise would plainly be violative of her family duties. The marital state is in its very nature superior, but not so exclusive and forbidding as to work a severance, unreasonably and arbitrarily, of all communion between the wife and her near of kin. Nature's laws are not so amenable to human decree. Neither spouse may allow filial love and affection, commendable as it is, to override conjugal duty. But marital unity would not be served by capricious restrictions upon the natural freedom of either spouse; quite the contrary.

A wife's separation from her husband for his refusal to permit her to live with him "unless she gave up all intercourse with her mother" was held to be involuntary and not a ground for divorce. She was willing to live with her husband "if he would permit her occasionally to visit her mother." The leaving "was coerced by a harsh and unnatural condition"; the wife "was at no time unwilling to return and live with" her husband "as his wife if that condition was withdrawn," and thus the separation did not constitute desertion. *Williams v. Williams,* 130 *N. Y.* 193, 29 *N. E.* 98, 14 *L. R. A.* 220 (*Ct. App.* 1891).

The jurisdiction here asserted has its origin also in the protection that is due to the incompetent and helpless, an historic function of equity, and it matters not whether it be invoked by complaint in a plenary proceeding or by the ancient writ of *habeas corpus.*

Marion's choice is to be free and uncoerced by psychological pressure that cannot but aggravate the stresses and strains of her paralyzing illness. Compassionate understanding and accommodation by her husband and her parents will spare her an ordeal making for tension and anxiety and the arrest of the rehabilitative process. The judicial process is to be exerted to effectuate the principles here delineated. The welfare of the stricken wife is the determining consideration.

There shall be a full hearing according to the established modes of equitable procedure, and the judgment shall be so framed as to insure the exercise of such relief as may be

awarded with emotional restraint. We were assured by counsel on the oral argument that the plaintiff parents would not transgress the proprieties if they were afforded access to their daughter. And the court has the power to bar unbecoming conduct and to enforce its decree to that end.

The judgment is accordingly reversed, and the cause is remanded for further proceedings in conformity with this opinion.

*For reversal*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, BURLING, JACOBS and BRENNAN—6.

*For affirmance*—None.