695 A.2d 382

GERTRUDE SHAMBAUGH, PLAINTIFF
v. WILLIAM WOLK, DEFENDANT.

Superior Court of New Jersey
Chancery Division Family Part
Cape May County

July 31, 1996.

*Charles A. Matison (Cooper Perskie April Niedelman Wagenheim & Levenson)* for plaintiff.

*Richard A. Russell* for defendant.

BATTEN, J.S.C.

These pre-trial cross-motions for summary judgment require this court to determine whether there presently exists constitutional, statutory and/or common law authority as would entitle, under the facts stipulated herein, plaintiff Gertrude Shambaugh, the 53 year-old stepdaughter of the defendant William Wolk, to visitation with her natural mother who is 75 years of age, married to defendant and currently resident in a convalescent home. To the extent that such authority does exist, the court is further asked to balance the competing interests of the defendant stepfather, married 42 years to plaintiff's mother, with the interests of plaintiff in maintaining visitational access to her mother. There is no reported opinion in this or any other state which resolves these issues. As such, this case is one of first impression.[1]

---

[1] This opinion memorializes the oral decision rendered by the court on July 31, 1996.

## PROCEDURAL SETTING

Plaintiff's motion seeks an order of the court granting plaintiff liberal and reasonable visitation with her mother, including the right to remove her mother from a convalescent center, for short periods of time. In her initial certification, plaintiff explains that she is the step-daughter of the defendant and the natural daughter of defendant's wife, Margaret Wolk, who is 75 years of age and is currently residing in Courthouse Convalescent Center, situated in Cape May Court House, New Jersey. Plaintiff is the oldest of the two (2) children born to Margaret Wolk during her first marriage. Ms. Wolk married defendant on October 24, 1953; a daughter, Carole, approximately 40 years of age, was born of this marriage. Ms. Wolk also has four (4) sisters and two (2) brothers.

Plaintiff claims to have had a close relationship with her mother. For at least three (3) years, Ms. Wolk has been exhibiting memory loss, the extent and effect of which, plaintiff claims, have been minimized by defendant who, when questioned by family members, attributes this conduct to just short term memory loss.

In October 1995, and without prior notification to family members, defendant had Ms. Wolk committed to the Atlantic City Medical Center's Psychiatric Unit. Defendant notified Ms. Wolk's sister that Ms. Wolk was admitted to a mental hospital and was not to have any visitors. Family members, including plaintiff, later discovered the whereabouts of Ms. Wolk and upon contacting the hospital learned Ms. Wolk was, in fact, allowed visitors.[2] Within a few days of the hospitalization, defendant threatened plaintiff that if any family members attempted to see Ms. Wolk, they would not only be stopped but would never see her again.

On October 13, 1995, plaintiff attempted to visit her mother and was advised by staff that, pursuant to instructions by the defendant, she was not permitted to visit Ms. Wolk nor be provided any information pertaining to her mother. The next day, plaintiff

---

[2] Plaintiff determined independently that defendant had instructed the hospital that visitation was not to be allowed.

telephoned the hospital and was told that any calls regarding her mother would be referred to defendant. She immediately retained counsel who requested that defendant permit plaintiff to visit with her mother. Defendant's counsel thereupon advised that (1) Ms. Wolk had been transferred to Courthouse Convalescent Center in Cape May Court House and (2) the issue of visitation by family members would abide evaluation by Dr. Robert Beitman. Thereafter, for a period of approximately two (2) months, plaintiff visited with her mother on a regular basis but only within the confines of the convalescent home.

In December 1995, plaintiff requested permission to visit with Ms. Wolk beyond the grounds of the Center for walks, meals, social events and overnight visits. Defendant denied the request and has maintained ongoing objection thereto. Plaintiff thus seeks an order permitting her such visitation on the assumption that her mother consents thereto and, to plaintiff's knowledge, has yet to express disapproval or any concerns at all about the quantum and consequence of such visitation.

Defendant cross-moves for an order for summary judgment dismissing plaintiff's complaint for lack of jurisdiction. He certifies that he and his wife have been married for 42 years, he visits her daily, and plaintiff, at age 18, left home, as a result of which their relationship became strained. In 1980, a "small feud" erupted consequent to the death of Ms. Wolk's mother; ever since, there has been virtually no contact between plaintiff and her mother. Throughout this period of time, defendant and Ms. Wolk maintained their close and loving relationship, as well as their relationship with their own daughter. Defendant claims to have done everything for Ms. Wolk from "shopping" to "finances".

The effects of Alzheimers Disease upon Ms. Wolk, at present, include conduct which defendant describes as child-like. Placement of Ms. Wolk in a nursing home was the consequence of defendant's age, "poor health" [3] and his inability to handle the

---

[3] Defendant states that he recently suffered a "mild stroke".

periodic crises that befell his wife. Ms. Wolk "is lucid maybe 5 days per week" and has "sundown syndrome" that leaves her confused by the end of the day. She enjoys defendant's visits and has expressed her desire not to go out with plaintiff and her sister. He states that twenty-five percent (25%) of the time Ms. Wolk does not remember the family tensions and welcomes any family member, causing her emotional unrest when she is taken out of her setting. Defendant thus objects to Ms. Wolk being removed from the nursing home by plaintiff. While he has no objection to plaintiff visiting Ms. Wolk for brief periods in the nursing home, he strongly objects to her removal from this facility. Ms. Wolk has executed a general power of attorney, designating defendant as attorney-in-fact, and a will, designating defendant sole heir to her estate. Accordingly, he feels that he has the authority to determine the issue of visitational access to Ms. Wolk.

By way of reply, plaintiff submits the certification of Dr. Robert G. Beitman, Ms. Wolk's treating physician, indicating his professional opinion as to Ms. Wolk's mental competency to determine, for herself, the extent of her relationship with plaintiff.

### LEGAL ARGUMENTS

Defendant argues, fundamentally, that the court lacks jurisdiction to grant the relief now sought by plaintiff and is therefore without authority to tell Mr. and Mrs. Wolk, after forty-two (42) years of marriage, whom they may visit and under what circumstances visitation may be conducted, noting that the statutory authority for visitation, as a corollary to custody, applies to a parent and an unemancipated minor—not a parent and adult son or daughter. *N.J.S.A.* 2A:34-28, through–52; *N.J.S.A.* 9:2-1, through–21; *N.J.S.A.* 2A:4A–21, through–62, *N.J.S.A.* 30:4C–11, through–24.

Plaintiff responds, asserting the court's jurisdiction to consider and grant the relief sought by plaintiff pursuant to the language of *R.* 5, part V, and reported case law historically interpreting the equitable power of the Chancery Division to consider the issues

herein raised, citing *Leith v. Horgan,* 13 *N.J.* 467, 100 *A.2d* 175 (1953); The "Historical and Organizational Note" to Part V of the New Jersey Court Rules (*R.* 5:1–1); *Belgacem v. Veneziano,* 218 *N.J.Super.* 6, 526 *A.2d* 1090 (App.Div.1986); *Westinghouse Electric Corporation v. United Electrical, Radio and Machine Workers of America,* 139 *N.J.Eq.* 97, 108, 49 *A.2d* 896 (E. & A.1946); *Graf v. Hope Building Corporation,* 132 *Misc.* 352, 229 *N.Y.S.* 455 (N.Y.Sup.1928), *aff'd,* 226 *A.D.* 787, 234 *N.Y.S.* 803 (1 Dept.1929), *rev'd,* 254 *N.Y.* 1, 171 *N.E.* 884, 70 *A.L.R.* 984 (N.Y.1930); *Griswold v. Hazard,* 141 *U.S.* 260, 11 *S.Ct.* 972, 35 *L.Ed.* 678 (1891). Plaintiff specifically argues that the Superior Court of New Jersey, Chancery Division, Family Part, has jurisdiction over all family actions. This grant of jurisdiction has been interpreted in the broadest and most inclusive sense. *R.* 5:1–2(a). Plaintiff asserts that in addition to having authority over a parent's application to ensure visitation rights with a child, the court also has authority to decide an application by an adult child to protect his or her visitational relationship with a consenting parent.

Defendant counters plaintiff's argument, however, claiming that reliance upon the rules is misplaced. These rules were enacted by the Legislature to establish court procedure; they do not create jurisdiction where it did not previously exist. In this case, defendant argues, plaintiff is seeking to invade the constitutional right of defendant and Ms. Wolk to privacy, a legal right which does not fall within the court's general equity jurisdiction.

Given the unique nature of the right herein asserted by plaintiff, that being, the right of an adult daughter to visitational access to her natural mother, a review of relevant case law—both within and beyond this state—specifically as relates to the nature of the relationship between a parent and child or, as here the case, adult daughter, is of value.

### DECISION

■ Interestingly, attainment of majority age and/or emancipation is not determinative to the existence or termination of the

legal relationship between a parent and child in all cases and may be, in certain cases, wholly irrelevant. The historical and progressive expansion of judicial doctrine in this regard transcends age, evolving and resolving around the nature of the relationship asserted. While the relation of parent and child, for example, usually terminates when the child reaches the age of majority or when the parent dies, the relation may, in some respects, continue beyond attainment of majority or death of the parent. Only the legislature can determine when and in what respects the relation of parent and child ceases, *Wilson v. Anderson*, 232 *N.C.* 212, 59 *S.E.*2d 836 (1950), *reh'g den.*, 232 *N.C.* 521, 61 *S.E.*2d 447 (1950), and a statutory enumeration of the instances when the authority of a parent ceases excludes other instances; *In re Reinhardt*, 88 *Mont.* 282, 292 *P.* 582 (1930).

The rights and obligations growing out of the relation of parent and child do not necessarily continue until, or terminate on, the child's attainment of majority, *Brown v. Ramsay*, 29 *N.J.L.* 117 (Sup.Ct.1860), and by the consent of the parties they may be terminated before, *Brown v. Ramsay, supra*, or continue in full force after such time; *Emery–Bird–Thayer Dry Goods Co. v. Coomer*, 87 *Mo.App.* 404 (Mo); *Brown v. Ramsay, supra*. The relationship created by birth is, in a sense, permanent, *Bryant v. Thrower*, 239 *Ark.* 783, 394 *S.W.*2d 488 (1965), and some of the rights of the parties may continue even though the child has attained majority or has married, even where there is no agreement on the subject; *Leith v. Horgan, supra; Bickford v. Bickford*, 83 *Misc.*2d 571, 371 *N.Y.S.*2d 782 (N.Y.Fam.Ct.1975), *rev'd.* 55 *A.D.*2d 719, 389 *N.Y.S.*2d 430 (3 Dept., 1976). For whatever the duration of the relation, however, its most fundamental consequence is parental right to custody of the child.[4] The common law

---

[4] Custody having been defined in *Black's Law Dictionary* as:

The care and control of a thing or person. The keeping, guarding, care, watch, inspection, preservation or security of a thing, carrying with it the idea of the thing being within the immediate personal care and control of the person to whose custody it is subjected. Immediate charge and control,

right to visitation, a derivative of parental custody, has historically applied only to natural parents of the child involved or those standing *in loco parentis* [5]. Our legislature has granted standing to siblings and grandparents of a child to "apply" to the Superior Court for such visitational rights, if any, "as the best interest of the child may require". *N.J.S.A.* 9:2–7.1. There exists, however, no statute, in this state, as argued by defendant, which expressly creates a right of visitation by a daughter, of majority age, with her mother. In this regard, the visitation sought by plaintiff is not derivative of her status as natural parent of the person with whom the visitation is sought but, instead, a claim of independent right to visitational *access*, by an adult daughter, to her natural mother, by virtue of their genetic heritage and consequent relationship.

Plaintiff cites the "Historical and Organizational Note" to Part V of the New Jersey Court Rules (*R.* 5:1–1) as *independent* authority for the court's assertion of jurisdiction under these facts. This argument bears merit yet is not entirely dispositive. First, while the court, on the basis of the pleadings filed, has no basis to doubt the sincerity of the positions alleged by either party, a critical distinction must be drawn between a visitational issue affecting a "parent and child" in the more traditional sense, i.e., the child remains unemancipated and therefore entitled to substantial rights in relation to the natural parents, and a visitational issue affecting a 52 year-old daughter and her 75 year-old mother who has not been named as a party to the action.

---

and not the final, absolute control of ownership, implying responsibility for the protection and preservation of the thing in custody. Also the detainer of a man's person by virtue of a lawful process or authority.
[*Black's Law Dictionary*, 347 (5th ed. 1979).]

[5] *See A.S. v. B.S.*, 139 *N.J.Super.* 366, 354 A.2d 100 (Ch.Div.1976), *aff'd*, 150 *N.J.Super.* 122, 374 A.2d 1259 (App.Div.1977); *Savoie v. Savoie*, 245 *N.J.Super.* 1, 583 A.2d 762 (App.Div.1990); *Zack v. Fiebert*, 235 *N.J.Super.* 424, 563 A.2d 58 (App.Div.1989); *Matter of Adoption of Child by J.M.G.*, 267 *N.J.Super.* 622, 632 A.2d 550 (Ch.Div.1993).

■ The action filed and motions thus brought are, as plaintiff asserts, "family actions" but only to the extent that the plaintiff seeks resolution of her quest for more expansive visitational access to her natural mother. Defendant claims, most fundamentally, that this is not enough, the language of *R.* 5:1–2(a) notwithstanding.[6] Admittedly, there exists neither common law nor statutory precedence for this action, i.e. custody, support, visitation, as exist in all other family actions. For this reason, plaintiff's reliance upon *Leith v. Horgan, supra,* is also misplaced. There, two natural parents sought enforcement of their "rights of visitation" with their invalid daughter, a mother of 5 children and, given her September 21, 1935 marriage and May 27, 1950 debilitating mishap, presumably of majority age.[7] "Totally disabled" yet of "full mental competence", the daughter was placed in a nursing home by her husband who thereupon concealed her whereabouts from her parents. In its 1953 opinion, our Supreme Court asserted jurisdiction on two grounds: first,

> The enlightened jurisprudence of the present day accords to the wife in full measure the equality and dignity that are hers of natural right as the mistress of the family, and the freedom, privileges and prerogatives in keeping with her exalted station—such as are incompatible with the notion of subordination to a

[6] *Rule* 5:1–2(a) states, in pertinent part, that actions cognizable in the Family Part include not only those specifically enumerated in the rules but "all other civil actions and proceedings unique to and arising out of a family or family-type relationship". Comment One to *R.* 5:1–2 enumerates a host of cases in which the courts of this state have interpreted this rule broadly so as to recognize the jurisdiction of the Family Part over a great variety of claims, provided only that they arise out of the family relationship. The Family Part therefore enjoys integrated jurisdiction over all family matters, irrespective of the separate courts and division to which they had formerly been allocated. *See, e.g., Belgacem v. Veneziano,* 218 *N.J.Super.* 6, 526 *A.2d* 1090 (App.Div.1986).

[7] The court thus disagrees with defense counsel's position that "this case fell within Title 9 of New Jersey Statutes Annotated, thereby enabling the court to deal with the matters". Title 9, by its own text, applies only to custody and visitational issues relating to a "minor child" per *N.J.S.A.* 9:1–1; *N.J.S.A.* 9:2–1, 2, 3, 4, 5, 7.1, 7.2, 9, 13(b); *N.J.S.A.* 9:3–18(b); *N.J.S.A.* 9:5–1; *N.J.S.A.* 9:6–8.9; *N.J.S.A.* 9:6–8.21; *N.J.S.A.* 9:17A–1; *N.J.S.A.* 9:17B–1, 3; *N.J.S.A.* 9:24–4(e). The daughter with whom plaintiffs sought visitation in *Leith, supra,* was of majority age, thus rendering Title 9 inapplicable.

degree interdicting intercourse with her parents and kinsfolk, unless in the special circumstances their exercise would plainly be violative of her family duties. The marital state is in its very nature superior, but not so exclusive and forbidding as to work a severance, unreasonably and arbitrarily, of all communion between the wife and her near of kin. Nature's laws are not so amenable to human decree. Neither spouse may allow filial love and affection, commendable as it is, to override conjugal duty. But *marital unity would not be served by capricious restrictions upon the natural freedom of either spouse;* quite the contrary.

[*Leith v. Horgan, supra,* at 476–77, 100 A.2d 175. (emphasis added) ]

and, second,

The *jurisdiction here asserted* has *its origin also* in the protection that is due the incompetent and helpless, an historic function of equity, and it matters not whether it be invoked by complaint in a plenary proceeding or by the ancient writ of *habeas corpus.*

[13 *N.J.* at 477, 100 A.2d 175. (emphasis added) ]

Importantly, this assertion of jurisdiction on a *parens patriae* basis was separate and apart from the court's initial assertion of jurisdiction grounded in the "equality and dignity that are [the daughter's] of natural right ... and the freedom, privileges and prerogatives in keeping with her exalted station" as wife, mother, and, equally, daughter, thus entitling her to "communion" with "her near of kin". *Leith v. Horgan, supra,* at 476, 100 A.2d 175. A careful reading of *R.* 5:1 allows—indeed, compels—a similar jurisdictional finding. Indeed, the "Historical and Organizational Note" to Part V of the *New Jersey Court Rules* states:

The scheme of the new Part V, as has been heretofore suggested, is to specifically provide for all civil family actions in Chapter II (*R.* 5:6 to 5:14), for actions involving families in crisis in Chapter III (*R.* 5:15 to *R.* 5:18) and for juvenile delinquency actions in Chapter IV (*R.* 5:19 to *R.* 5:25). *Chapter I sets forth general provisions applicable to all family actions except juvenile delinquency actions unless specifically otherwise noted. Thus, R. 5:1 and R. 5:2 address, respectively, cognizability and venue....* (emphasis added)

As such, the *full* text of the Note clearly establishes that the revised Part V of the Rules does not portend to enhance the jurisdiction of the Family Part but, instead, enhances the classifications of actions therein cognizable. In this regard, Part V is, as argued by defense counsel, a procedural—as opposed to substantive—enactment yet it need not be construed as substantive expansion of the jurisdiction of the Family Part, however, as a predicate to the court's proper assertion of jurisdiction. Case law

more recent than our Supreme Court decision in *Leith v. Horgan,* *supra,* in 1953, reveals the court's continuing recognition—if only in *dicta*—that common family heritage is, has been, and remains a status between persons which gives rise to special interests, obligations, and, indeed, rights, without regard to age in appropriate cases. Factors other than age may, indeed, be determinative. Reported cases provide further guidance.

Although establishment and maintenance of the biological family unit is a matter of legitimate concern to the court when, as here, asked to define rights and duties between parties, biological relationship is not the exclusive consideration. On the contrary, a psychological relationship may, in certain and appropriate circumstances, warrant the same significance in determining, for example, the best interests of a child; *Hoy v. Willis,* 165 *N.J.Super.* 265, 398 *A.2d* 109 (App.Div.1978); *see Matter of Guardianship of J.P.M.,* 210 *N.J.Super.* 512, 510 *A.2d* 117 (Ch.Div.1985). The parent/child relationship itself constitutes a status, as opposed to contractual right, independent of age of the parties in many cases. In evaluating the relationship between a parent and child, all doubts ordinarily—indeed, historically—have been resolved against its destruction. *In re N,* 96 *N.J.Super.* 415, 233 *A.2d* 188 (App.Div.1967); *Savoia v. F.W. Woolworth Co.,* 88 *N.J.Super.* 153, 211 *A.2d* 214 (App.Div.1965). A natural parent's right to custody, being constitutional in nature, is not, however, absolute; *Sorentino v. Family & Children's Society of Elizabeth,* 74 *N.J.* 313, 378 *A.2d* 18 (1977); *In Re J.S. & C.,* 129 *N.J.Super.* 486, 324 *A.2d* 90 (Ch.Div.1974), *aff'd,* 142 *N.J.Super.* 499, 362 *A.2d* 54 (App.Div. 1976); *U.S. Constitution,* Amendments I, IX and XIV. For example, the rights of freedom of religion and parenthood are not beyond limitation; *State v. Perricone,* 37 *N.J.* 463, 181 *A.2d* 751 (1962), *certiorari denied* 371 *U.S.* 890, 83 *S.Ct.* 189, 9 *L.Ed.*2d 124 (1962). A natural parent's right to custody has been adjudicated to be secondary to the legitimate concern of the state in protecting and advancing the health, safety and welfare of the children within its jurisdiction; *In re Adoption of Child,* 114 *N.J.Super.* 584, 277 *A.2d* 566 (App.Div.1971). Actions of individuals as relate to

minors are therefore subject to state regulation so long as the means sought to achieve the regulation bears reasonable relationship to the legitimate state interests in protecting the health, safety and welfare of its children and is neither arbitrary, capricious nor unreasonable; *R.T. v. J.E.*, 277 *N.J.Super.* 595, 650 *A.*2d 13 (Ch.Div.1994). The legal rights of natural parents to the custody and enjoyment of a natural child must be recognized, however, unless sufficient circumstances exist as warrant derogation thereof. The rights of natural parents in this regard thus constitute a trust reposed in natural parents by the state; *In re Jacques*, 48 *N.J.Super.* 523, 138 *A.*2d 581 (Ch.Div.1958). The benchmark inquiry and overriding consideration, in all "parent-child" custody and visitation cases, is the "best interests of the child"; *Wilke v. Culp*, 196 *N.J.Super.* 487, 483 *A.*2d 420 (App.Div. 1984); *N.J.S.A.* 9:2–4.

There exists virtually no common law, however, relative to the extent and nature of the relationship between a parent and his or her adult son or daughter, perhaps due to the very concept of emancipation which signifies the surrender and renunciation of correlative rights and duties touching care and custody of a child. *Limpert v. Limpert*, 119 *N.J.Super.* 438, 292 *A.*2d 38 (App.Div. 1972); *Schumm v. Schumm*, 122 *N.J.Super.* 146, 299 *A.*2d 423 (Ch.Div.1973). Emancipation of a child therefore affects a parent's right to custody and, as a corollary to custody, visitation with the child. Once a child is legally emancipated, the state no longer asserts its strong interest in maintaining the family unit; *Weinberg v. Underwood*, 101 *N.J.Super.* 448, 244 *A.*2d 538 (Cty.Ct. 1968). In *Weinberg, supra,* Judge Yancey, then a county court judge, found no basis to extend the doctrine of tort immunity between parents and child where, as there, the child on whose behalf the doctrine was sought to be invoked was thirty years of age and, further, there existed no "compelling reason" to extend the doctrine. This language affirms our Supreme Court's decision, rendered fifteen years earlier in *Leith v. Horgan, supra,* that "compelling" circumstances given rise within the family setting may warrant an appropriate assertion of jurisdiction if only, as

therein the case, in affirmation of the family member's right to communion with his or her "near of kin". 13 *N.J.* at 476, 100 *A.*2d 175.

The reported opinion most factually proximate to the instant case recognized the "necessity and importance of the right of siblings to visit one another"; *L. v. G., supra,* 203 *N.J.Super.* at 385, 398, 497 *A.*2d 215 (Ch.Div.1985). There, adult siblings brought an action against a natural parent and step-parent to obtain visitation with a minor sibling at a site away from the parents' premises due to animosity between the father and step-mother and the adult children, as is substantially here the case.[8] In the first reported opinion of this or any other state holding that adult, emancipated siblings have a natural right to visit with their minor siblings, Judge Krafte resolved the jurisdictional challenge in favor of the plaintiff siblings, stating:

> There is no question that during *pending* or *post-judgment* matrimonial litigation, our legislature, in *N.J.S.A.* 2A:34–23, provided the courts of this state with broad powers to make determinations concerning the care, custody, education and maintenance of children. Moreover, *R.* 5:1–2(a) provides in pertinent part:
>
>> "All civil actions in which the principal claim is unique to or arises out of a family or family-type relationship shall be brought in the Family Part...."
>
> Based upon the above-cited authority, this court is satisfied that the instant case is well within its jurisdictional confines as it pertains to [the minor child].
>
> [203 *N.J.Super.* at 390, 497 *A.*2d 215.]

Thus, finding that our Legislature, per *N.J.S.A.* 2A:34–23, and our Supreme Court, per *R.* 5:1–2(a), had afforded independent bases for assertion of jurisdiction, Judge Krafte concluded that plaintiffs possessed standing to bring the action, notwithstanding the absence of either common law or statutory right of emancipated siblings to request visitation with a minor sibling:

> Again, this court refers to *R.* 5:1–2(a), which includes as cognizable in the family part "all civil actions in which the principal claim is unique to or arises out of a family or family-type relationship...." It stands to reason that *an immediate*

---

[8] The only factual distinction between *L. v. G., supra,* and the case at bar relates to the status of the person with whom the off-premises visitation was sought. There, adult siblings sought off-premises visitation with their minor sibling. Here, an adult daughter seeks off-premises visitation with her mother.

*family member, such as a parent, grandparent, brother or sister, would possess an interest which is, at the very least, equal to, if not superior to that of any other person who may possibly have a stake in the outcome of an action which is cognizable in the Family Part. What right could be more basic, more precious than that of sharing life experiences with one's own brother or sister?* Surely, *nothing can equal or replace either the emotional or biological bonds* which exists between siblings, or the memories of trials and tribulations endured together, brotherly or sisterly quarrels and reconciliations, and the sharing of secrets, fears and dreams. *To be able to establish and nurture such a relationship is, without question, a natural, inalienable right which is bestowed upon one merely by virtue of birth into the same family. See R.* 5:1–2(a). Therefore, this court finds that plaintiffs are clearly interested parties in this case, and have standing to seek relief by their request for visitation with their siblings.

[203 *N.J.Super.* at 390–391, 497 *A.*2d 215. (emphasis added)[9]]

Judge Krafte further predicated this declaration of "a natural, inalienable right ... bestowed upon one merely by virtue of birth into the same family ..."[10] upon the biological reality recognized by our Supreme Court in *Mimkon v. Ford,* 66 *N.J.* 426, 332 *A.*2d 199 (1975), citing the "special quality of a grandparent/grandchild relationship". The Court there reasoned that:

It is biological fact that grandparents are bound to their grandchildren by the *unbreakable links of heredity....* A very special relationship often arises and continues between those very same grandparents and grandchildren.... Visits with a grandparent are often a precious part of a child's experience, and there are benefits which devolve upon the grandchild from the relationship with his grandparents which he cannot derive from any other relationship. Neither the legislature nor this court is blind to *human truths* which grandparents and grandchildren have always known.

[66 *N.J.* at 437, 332 *A.*2d 199 (Emphasis added).]

---

[9] As of the June 18, 1985 opinion in *L. v. G., supra, N.J.S.A.* 9:2–7.1 afforded standing only to a grandparent or grandparents of a child of a parent or parents who are deceased, separated or divorced. Statutory standing was not then afforded to siblings.

[10] An "inalienable" right has been described as one "not capable of being surrendered or transferred without the consent of the one possessing such right, e.g. freedom of speech or religion, due process and equal protection of the laws;" *Morrison v. State,* 252 *S.W.*2d 97, 101 (Mo.App.1952); and, as used in a statute providing aid to dependent children, "a right which cannot be transferred from one for whom it is intended"; *Goodyear Service Store v. Speck,* 48 *Ohio App.*2d 115, 355 *N.E.*2d 886, 888 (1976).

Consistent with our Supreme Court's assertion of jurisdiction to ascertain continuation of a grandparent/grandchild relationship in *Mimkon v. Ford, supra,* so, too, did Judge Krafte assert jurisdiction to ascertain continuation of a sibling relationship in *L. v. G., supra.* Consideration and application of the very language and rationale of these cases resolves the jurisdictional issue in this case as well.

### *"Unbreakable Links of Heredity" and "Human Truths": An Emerging Doctrine.*

Analogizing these notions of "acute sensitivities and sensibilities" relating to grandparent visitation and the judicially-created "presumption that the best interests of the child ordinarily are served by maintaining their contact and communication with their grandparents", *Globman v. Globman,* 158 *N.J.Super.* 338, 345–46, 386 *A.*2d 390 (App.Div.1978), *certif. denied,* 77 *N.J.* 493, 391 *A.*2d 507 (1978), to the "biological fact", found by our Supreme Court, that grandparents are "bound" to their grandchildren by "unbreakable links of heredity", *Mimkon v. Ford,* 66 *N.J.* at 437, 332 *A.*2d 199, Judge Krafte concluded that

> so too are siblings bound to one another by virtue of the fact that they were born to, and in most cases, raised by, the same biological parents. A sibling relationship can be an independent emotionally supportive factor for children in ways quite distinctive from other relationships, and there are benefits and experiences that a child reaps from a relationship with his or her brother(s) or sister(s) which truly cannot be derived from any other. Those of us who have been fortunate enough to experience a sibling relationship are aware of these basic *human truths.* Surely, the right to visit with one's own brother or sister is equal to, if not greater than the right to visit with one's grandchildren. While the Legislature has extended such a privilege to grandparents, it has yet to accord siblings the same right. The fact that custodial parents may not desire visitation between their children and the children's sibling, can never, in and of itself, be a sufficient reason for denying that visitation. Rather, this court finds that its inquiry must focus upon whether the child's best interests will be served by maintaining contact and communication with their siblings.
>
> [20 *N.J.Super.* at 395, 90 *A.*2d 85. (Emphasis added).]

While, in the instant case, the relative with whom visitation is sought is not a minor sibling but, instead, the mother of an adult daughter, the analogy and rationale employed by Judge Krafte

remain instructive and, indeed, determinative of the jurisdictional issue. After all, "... analogy is the vessel that carries meaning from old to new in the law ..."; *In re Grady,* 170 *N.J.Super.* 98, 405 *A.*2d 851 (Ch.Div.1979), *vacated,* 85 *N.J.* 235, 247, 426 *A.*2d 467 (1981).

First, this court finds, as did Judge Krafte, that *R.* 5:1–2(a) renders mandatory, and not permissive, cognition by the Family Part as to "all civil actions in which the principal claim is unique to or arises out of a family or family-type relationship...." Clearly, the instant action is "civil" in nature and its principal claim relates to visitation by an adult daughter with her mother at and beyond the convalescent center at which her mother has been placed by her stepfather. There can be little doubt that, but for the mother/daughter relationship, this action would not have been brought. Jurisdiction is therefore properly asserted by the Family Part pursuant to *R.* 5:1–2(a).[11] Second, plaintiff need not bring this visitation action under the same caption as contained the names of her natural parents in their "matrimonial action brought in this state or elsewhere" as a pre-requisite to standing. Any such requirement would have precluded plaintiffs in *L. v. G., supra,* from prosecuting their visitation action in their own names. A new and different action may be brought here, as in *L. v. G., supra,* by the family member seeking visitation, naming as defendants each party in interest.

Plaintiff also survives the defendant's challenge to standing, here, as in *L. v. G., supra,* in that the relief sought by plaintiff relates to her natural mother, satisfying Judge Krafte's definition of "immediate family member, such as a parent...." *Id.* at 390, 497 *A.*2d 215. The mother/daughter relationship here involved constitutes, in this court's judgment, the *most* immediate and

---

[11] In so holding, the court is unable to find that the facts of record support assertion of jurisdiction per *N.J.S.A.* 2A:34–23. Assertion of jurisdiction pursuant to *R.* 5:1–2(a), per the analysis of Judge Krafte in *L. v. G., supra,* renders statutory standing—or the lack of it—a moot issue.

direct "family ... relationship", certainly more direct than "that of any other person who may possibly have a stake in the outcome of an action which is cognizable in the family part". *Id.* The mother/daughter relationship is no less basic, no less precious than "sharing life experiences with one's own brother or sister." *Id.* at 390–391, 497 *A.*2d 215. The "emotional and biological bonds ... the memories of trials and tribulations endured together ... quarrels and reconciliations ... sharing of secrets, fears and dreams" are no less evident and significant in the mother/daughter relationship here involved than they were in the sibling relationship, so evident to Judge Krafte in *L. v. G., supra:*

> To be able to establish and nurture such a relationship is, without question, a natural inalienable right which is bestowed on one merely by virtue of birth into the same family. *See R.* 5:1–2(a). Therefore, this court finds that plaintiffs are clearly interested parties in this case and have standing to seek relief by their request for visitation with their sibling.
>
> [203 *N.J.Super.* at 391, 497 *A.*2d 215.]

The right of the natural daughter, in this case, to establish and nurture her relationship with her mother is, without question, a natural, inalienable right which is equally bestowed upon this plaintiff merely by virtue of her birth unto her natural mother (the spouse of the defendant). For this reason, plaintiff is clearly as interested a party as the adult sibling plaintiff in *L. v. G., supra,* and thus enjoys standing to seek relief by her request for visitation with her natural mother.[12]

It must be noted that the visitation sought by plaintiff, as relates to her mother, is of a different nature than the visitation sought by adult siblings with a minor sibling, in *L. v. G., supra.* In the latter instance, the visitation sought was a corollary to the natural parents' right to care, custody and earnings of the child.

---

[12] In so finding, the court notes Judge Krafte's conclusion that the "human truths" so evident to our Supreme Court in a grandparent/grandchild relationship, *Mimkon v. Ford,* 66 *N.J.* 426, 437, 332 *A.*2d 199 (1975), are no less evident in the sibling relationship of *L. v. G.,* 203 *N.J.Super.* 385, 497 *A.*2d 215. To the extent applicable to the relationships of grandparents/grandchildren and adult siblings-child siblings, these same "human truths" are no less indigenous to the relationship here involved, that of mother-adult daughter.

*Limpert, supra; N.J.S.A.* 9:2–4. The visitation now sought by plaintiff in the instant case is neither derivative of nor corollary to a right of custody but, instead, a right of visitational access, unrelated to the traditional notions of parental custody, and is predicated, instead, upon the "biological fact" recognized by our Supreme Court in *Mimkon v. Ford, supra,* that, there, grandchildren, and, as here, mother and daughter, "share unbreakable links of heredity" giving rise to a "very special relationship", albeit different than the sibling relationship of *L. v. G., supra,* whose "benefits ... cannot derive from any other relationship". 203 *N.J.Super.* at 393, 497 *A.*2d 215.

Having found a basis for assertion of jurisdiction per *R.* 5:1–2(a) and having further found standing on the part of plaintiff by virtue of her status as an "immediate family member" seeking visitational access to her natural mother, thus constituting a "family ... relationship", the court must now determine the extent, if any, of plaintiff's right to visitational access to her natural mother and the effect of defendant's objection thereto in his capacities as (1) Ms. Wolk's husband; (2) her attorney-in-fact designated pursuant to *N.J.S.A.* 26:2H–53 through –78, the "New Jersey Advance Directives for Health Care Act"; and (3) sole heir to the estate of Ms. Wolk.

### Constitutional Analysis

The ultimate issue before the court, then, is whether a person's freedom of association and right to privacy, clearly afforded through the First and Fourth Amendments to the *United States Constitution,* are cognizable by this court within the context of these facts and the absence of any state action. The cornerstone to this analysis, as set forth hereinbelow, is the extent of competent consent by Ms. Wolk to the very relief sought by plaintiff.

Mutual consent to association between mother and adult daughter invokes the fundamental freedom and right of each to achieve and enjoy reciprocal access to one another. These fundamental rights to freedom of association and privacy, found within

the First and Fourth Amendments to our Constitution, and applied to the states through the Fourteenth Amendment, are protected from abridgment by Congress or any state.[13]

The rights to free association and privacy asserted by both plaintiff and defendant, each against the other in advancement of their separate relationship with Ms. Wolk, are in direct conflict. The right of Ms. Wolk, as natural mother to plaintiff and wife to defendant, to free association and privacy in these relationships is neither different from nor subordinate to the corresponding rights of the parties. Similarly, Ms. Wolk's right to be let alone, to be and remain free of unwarranted intrusion upon her zone of privacy, including her distinct and separate relationships with her daughter and husband, is equally "fundamental" an interest and, therefore, determinative. *Stanley v. Georgia*, 394 *U.S.* 557, 89 *S.Ct.* 1243, 22 *L.Ed.2d* 542 (1969). In *Stanley*, the Court cited with approval Justice Brandeis' dissent in *Olmstead v. U.S.*, 277 *U.S.* 438, 48 *S.Ct.* 564, 72 *L.Ed.* 944 (1928), in which he observed the intention of the makers of the *Constitution* to secure conditions favorable to the pursuit of happiness, specifically including "the right to be let alone—the most comprehensive of rights and the right most valued by civilized men". 277 *U.S.* at 478, 48 *S.Ct.* at 572. While freedom from governmental intrusion is shielded by the Bill of Rights, protection of a person's general right to privacy—the right to be let alone by other people—is, like the protection of a person's very property and life, left primarily to the law of the individual states; *Katz v. U.S.*, 389 *U.S.* 347, 350–351, 88 *S.Ct.* 507, 510–511, 19 *L.Ed.2d* 576 (1967); *Mills v. Atlantic City Dept. of Vital Statistics*, 148 *N.J.Super.* 302, 312, 372 *A.2d* 646 (Ch.Div.1977). Absence of state or other governmental action does not foreclose a remedy predicated upon common law recognizing those fundamental interests as to which the Bill of Rights precludes governmental infringement. In New Jersey, such deci-

---

[13] A more detailed constitutional analysis was contained in the court's trial opinion.

sional law exists. Indeed, as more fully cited hereinabove, our Supreme Court has recognized as a fundamental interest the relationship between parents and their adult daughter, *Leith v. Horgan, supra.* In rejecting the attempts of the daughter's husband to interfere with the daughter's access to her parents, the Court expressly held that:

> ... The marital state is in its very nature superior, but not so exclusive and forbidding as to work a severance, unreasonably and arbitrarily, of all communion between the wife and her near of kin. Nature's laws are not so amenable to human decree. Neither spouse may allow filial love and affection ... to override conjugal duty. But *marital unity would not be served by capricious restrictions upon the natural freedom of either spouse; quite the contrary.*
>
> [13 *N.J.* at 477, 100 *A.*2d 175. (Emphasis added)]

The "human truths" [14] consequent to "unbreakable links of heredity" [15] warrant cognizability of and substantive remedy for First and Fourth Amendment privacy claims in this court even in the absence of any governmental action whatsoever, particularly where, as here, filial affection between a mother and her adult daughter conflicts with marital relationship between that mother and her husband.

Plaintiff and defendant, plaintiff's stepfather, enjoy the very same First and Fourth Amendment freedoms of association as does the person over whom they struggle and about whom this dispute arises. Plaintiff continues to enjoy her right to visitational access with her natural mother to the extent that her natural mother thus consents, on her own, and without undue or inappropriate interference. Likewise, Ms. Wolk, from whom the court has not heard directly, continues to enjoy her right to such visitational access with plaintiff as she deems appropriate. These reciprocal rights to freedom of association and privacy, on the part of plaintiff and her natural mother, are not affected, as a matter of law, by the personal predisposition of defendant, notwithstanding his marital relationship to Ms. Wolk over a significant period of

---

[14] *L. v. G., supra,* at 395, 497 A.2d 215.

[15] *Mimkon v. Ford, supra,* at 437, 332 A.2d 199.

time. Defendant does not advance his attempted control over visitational access by plaintiff as a consequence of his wife's diminished "decision-making capacity" as defined by the "New Jersey Advanced Directives for Healthcare Act" ['Act']; *N.J.S.A.* 26:2H–53 through –78. Were this position assumed by defendant, the "dispute resolution" contained within the Act would provide a remedy; *N.J.S.A.* 26:2H–66. There exists no such allegation within this record, however, and the record contains the clear opinion of the "attending physician", Dr. Beitman, that Ms. Wolk is not presently under any mental or other incapacity as would preclude her from making and comprehending the consequences of appropriate decisions relating to the sought visitation. Therefore, threshold preconditions to the applicability of the statute have not been established, depriving defendant of this special statutory authority without affecting his status as spouse, heir and attorney-in-fact of Ms. Wolk. Plaintiff is therefore entitled to an order affirming her right to visitational access to her natural mother but only to the extent to which Ms. Wolk affirmatively consents. Inasmuch as a visitation schedule is neither specified by plaintiff nor approved by Ms. Wolk, there exist genuine issues as to the extent and circumstances of visitation mutually acceptable to both plaintiff and her mother. A hearing on these issues is therefore necessary and is so ordered.

Defendant's stated concerns about his wife's mental competency and physical condition may ultimately warrant a different result than the decision herein reached. Those concerns, however, are presently unsupported by the facts contained in this record. Indeed, the very language of the Act affords specific guidance as to the evidential threshold that must be satisfied precedent to invocation of its provisions. Specifically, the attending physician is required to (1) determine whether the patient lacks capacity to make particular health care decisions, *N.J.S.A.* 26:2H–60; and (2) advise the patient and the health care representative as to the physician's determination that the patient lacks decision-making

capacity to make a particular health care decision; *N.J.S.A.* 26:2H–60(e). Once achieved, both the patient and health care representative are entitled to recourse to the dispute resolution process. Indeed, the health care representative is specifically vested with statutory rights and responsibilities; *N.J.S.A.* 26:2H–61.[16] The attending physician also enjoys specific rights and bears specific responsibilities pursuant to the Act.[17] The statutory scheme further affords on-going evaluation of the patient's condition as to health care decisions. The process thus contemplated by the statute assures opportunity for dialogue relative to the patient's desire for visitation with family members, or, as here involved, Ms. Wolk's desire for visitational access to and with the plaintiff without affirmative and unwarranted interference by defendant. Clearly, plaintiff's mother has indicated to her treating physician, Dr. Beitman, that she seeks the very degree of visitation sought by plaintiff, that being, frequent visitation, beyond the grounds of the convalescent center and, in time, overnight visitation ultimately extending through an entire weekend. Defendant's attribution of such consent by Ms. Wolk to the initial effects of Alzheimer's disease upon her mental capacity is therefore

---

[16] The health care representative, upon determination that the patient lacks decision-making capacity, enjoys authority to make health care decisions on behalf of the patient, retain legal authority to make health care decisions on the patient's behalf, decline to serve in that capacity, exercise the patient's right to be informed of the patient's medical condition, prognosis and treatment option and give informed consent to, or refusal of, health care, and make such health care decisions as the patient would have made had he or she possessed decision-making capacity under the circumstances and in the best interests of the patient. *N.J.S.A.* 26:2H–61(a)–(f).

[17] The statute obligates the attending physician to make affirmative inquiry of the patient and family regarding the existence of an advanced directive, note the existence of such directive in the patient's medical records, and document change, if any, to that directive. The physician further may decline to participate in withholding or withdrawing of the measures utilized to sustain life in accordance with sincerely held personal or professional conviction and, in such case leading to transfer the patient's care, shall assure timely transfer of the patient's medical records to another treating physician.

without basis.[18]

▮ Parenthetically, the court notes the content and legal effect of the general durable power of attorney, *N.J.S.A.* 26:2H–53 through –78, designating defendant as attorney-in-fact on behalf of Ms. Wolk. The text of the document contains neither express nor implied assignment of any right of Ms. Wolk to render independently such decisions as are here involved relative to visitational access by Ms. Wolk with her children, all of them or any of them. Statutory authority governing such documents does not affect Ms. Wolk's ongoing right to decide this most significant issue alone and without unauthorized interference by her attorney-in-fact. On the contrary, the authority vested by the power of attorney is neither exclusive nor irrevocable and can be superseded by a competent principal at any time.[19] *Morrison v. State, supra; Goodyear Service Store v. Speck, supra; Matter of Peter by Johanning,* 108 *N.J.* 365, 529 *A.*2d 419 (1987).

So long as the personal conduct of these parties, toward one another as well as third parties, such as Ms. Wolk, does not affect others, each enjoys the freedom to think, decide and act as each sees fit. Such freedom is recognized in and protected by the First Amendment freedom of association and Fourth Amendment right to privacy. Just as our Supreme Court has ruled that "private consensual sexual conduct" represents an exercise of that right,

---

[18] While defendant's certification contains vague references to the onset of Alzheimer's disease and the initial "effects" thereof upon Ms. Wolk, this record contains no competent indicia of the onset of Alzheimer's and the certification of Dr. Beitman notably fails to contain such diagnosis or concern.

[19] For example, *N.J.S.A.* 46:2B–8, entitled "Power of attorney unaffected by disability of principal according to its terms; accountability of guardian; disability defined", clearly states that the rights and obligations of an attorney-in-fact or agent remain separate and distinct from the rights and obligations of a guardian appointed for the principal. Indeed, section (a) states, in pertinent part, that:

> If a guardian is appointed for the principal, the attorney-in-fact or agent, during the continuance of the appointment, *shall account* to the guardian rather than the principal. (Emphasis added)

Absent a guardian, the attorney-in-fact must account to the principal.

*State v. Saunders,* 75 *N.J.* 200, 225, 381 *A.*2d 333 (1977), so, too, is the consensual visitation between a mother and her adult daughter an exercise of that right, notwithstanding objection by the husband-stepfather. While no statute yet enacted has specifically addressed this right, the absence of legislative expression on this issue ought not be construed as anything other than our legislature's deference to those First Amendment freedoms and Fourth Amendment "zone of privacy" and its traditional understanding of the limitations thus placed upon all states' authority to minimize these freedoms through legislation; *State v. Saunders, supra.*

These parties–an adult stepdaughter and her stepfather–enjoy the very same First Amendment freedom of association and Fourth Amendment right to privacy as does the person over whom they struggle and about whom this dispute arises. Stated more generally, plaintiff continues to enjoy the right to visitational access to and privacy with her natural mother to the extent that her natural mother thus consents, on her own, and without undue or inappropriate interference. Likewise, Ms. Wolk, from whom the court has not heard directly, is entitled, through her First Amendment freedom of association and Fourth Amendment right to privacy, to such visitational access to and privacy with plaintiff as she deems appropriate. These reciprocal rights to freedom of association and privacy, on the part of plaintiff and her natural mother, are not affected, as a matter of law, by the personal predisposition of defendant, notwithstanding his marital relationship to Ms. Wolk over a significant period of time.[20]

Here, as in *L. v. G., supra,* the court is loath to order that Ms. Wolk be thrust into the middle of an apparently long-standing conflict between plaintiff and defendant, leaving Ms. Wolk to possibly be used as a pawn or weapon by one party against the other. This court expresses concern, as did Judge Krafte in *L. v.*

---

[20] While the court remains sensitive to defendant's stated concerns about the mental capacity of Ms. Wolk, there nonetheless exists neither a competent determination of mental incapacity nor an application for and consequent order appointing a guardian on behalf of Ms. Wolk. *N.J.S.A.* 3B:12–1 through –66.

*G., supra,* over the state of the parties' relationship and the extent to which suspicion of ill motive—each party to the other—has pervaded Ms. Wolk's relationships with her natural daughter and spouse. Absent resolution of this issue in a credible and lasting way, Ms. Wolk stands to lose more than either party. The hearing thus ordered will and should establish quickly, decisively and credibly the exact wishes of Ms. Wolk as relate to visitational access to and with plaintiff. Once ascertained, Ms. Wolk, in the absence of some disfirmity, should be left to this decision without undue influence from any third party, whether related by blood or not.